**Mars KETCHUM, et al.,
Plaintiffs-Appellants,**

v.

**Jane M. BYRNE, et al.,
Defendants-Appellees.**

Nos. 83–2044, 83–2065 and 83–2126.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1983.

Decided May 17, 1984.

As Amended May 23 and Aug. 14, 1984.[*]

Rehearing and Rehearing En Banc
Denied Sept. 10, 1984.

---

This is a revised opinion. The original panel opinion in this case was issued on May 17, 1984 and has been withdrawn. Judge Harlington

Wood, Jr. concurs fully in this revised opinion and has withdrawn his special concurrence in the original panel opinion.

Judson H. Miner, Davis, Miner, Barnhill & Galland, Chicago, Ill., for plaintiffs-appellants.

William J. Harte, William J. Harte, Ltd., Chicago, Ill., for defendants-appellees.

Before WOOD and CUDAHY, Circuit Judges, and KELLEHER, Senior District Judge.**

CUDAHY, Circuit Judge.

Plaintiffs, including individual black and Hispanic residents of the City of Chicago, sued several individual defendants and the City Council of the City of Chicago alleging that the 1981 redistricting plan for the aldermanic wards of Chicago violated section 2 of the Voting Rights Act of 1965, as amended on June 29, 1982, by Pub.L. No. 97–205, § 3, 96 Stat. 134 (1982), 42 U.S.C. § 1973 (1982), the fourteenth and fifteenth amendments to the U.S. Constitution, various federal civil rights statutes and several Illinois constitutional and statutory provisions. The district court rejected plaintiffs' fourteenth and fifteenth amendment claims but entered judgment for plaintiffs on their Voting Rights Act claim and subsequently adopted a new ward map. Plaintiffs now appeal this final district court order primarily because they deem the relief granted to be insufficient. For the reasons stated

** Honorable Robert J. Kelleher, Senior District Judge for the Central District of California, is sitting by designation.

1. The figure of 247,343 for the Hispanic population in 1970 is approximate and based on only a 15% sampling. Stip. 48. In the 1980 census, an Hispanic person was asked first to identify himself or herself as white, black or other and was then to indicate that he or she was Hispanic.

herein, we affirm in part, reverse in part and remand for reconsideration of the appropriate remedy.

## I

### Background

The City of Chicago is divided into fifty aldermanic wards, each with nearly equal population and composed of contiguous and compact territories. The City Council must redistrict the city on the basis of new census data by December 1 of the year following the taking of a national census. ILL. REV.STAT. ch. 24, §§ 21–36 and 21–38 (1981). The census taken in 1980 showed that the city population was 3,005,072 so that the ideal population per ward would be approximately 60,101 (Stipulation of Facts 52, Appendix B to Brief of Defendant-Appellee, The City Council of the City of Chicago) [the "Stip."]. Because virtually every ward varied from this ideal figure (Stip. 60), it was necessary for the City Council to devise a redistricting plan by December 1, 1981.

The demographic composition of Chicago changed significantly between 1970 and 1980 due to a major decrease in the size of the white population and increases in the size of the black and Hispanic populations. The respective population percentages were as follows (Stips. 48 and 52):[1]

|  | 1970 | 1980 |
|---|---|---|
| Non-Hispanic White | 65.5% | 43.2% |
| Black | 32.7% | 39.8% |
| Hispanic | 7.3% | 14.0% |

In 1970, blacks had a population majority in fifteen wards, but, in 1980, under the 1970 ward map, blacks had a majority in nineteen wards and a plurality of 49.3% in another ward. In 1970, Hispanics had no majority ward, but, in 1980, again under

As a result and because of other classifications such as Asian, the sum of the white, black and Hispanic figures does not equal the total population. Stip. 51. The 1980 figures on Hispanics are also not directly comparable to 1970 Hispanic census data because of such factors as overall improvements in the 1980 census and improved question design. BUREAU OF THE CENSUS, U.S. DEPT. OF COMMERCE, STATISTICAL ABSTRACT OF THE UNITED STATES: 1981, 3 (1981).

the 1970 map, Hispanics had four majority and two plurality wards. In 1980, therefore, non-Hispanic whites had a majority in twenty-two wards and, presumably, a plurality in two additional wards (Stip. 62; appellants' brief at 10–11).

In April and May of 1981, defendant Martin R. Murphy, Commissioner of the Department of Planning of the City of Chicago, and defendant Thomas E. Keane, former alderman of the 31st Ward, drafted a new ward map in conformance with the 1980 census population figures. In September and October 1981, Mr. Murphy consulted with various city officials and transmitted to the City Council's Subcommittee on Redistricting his census data and ward map draft. Information concerning each proposed new ward was submitted to the alderman currently representing that ward, but the city-wide map was not submitted to the City Council. This "October map" provided for twenty-four non-Hispanic white majority wards, eighteen black majority wards, five Hispanic majority wards and three wards with no majority (Stips. 73–84).

On November 9, 1981, the Subcommittee on Redistricting held its first and only public meeting at which the proposed ward map was publicly displayed for the first time. This map, like the "October map," provided for twenty-four white wards, eighteen black wards, five Hispanic wards and three wards without any majority, based on a figure of more than 50% of total population as constituting a majority. Commissioner Murphy, however, incorrectly stated at the meeting that the map provided for nineteen black majority wards and twenty-six white majority wards (Stips. 85–88).

After accepting certain amendments, the City Council, on November 30, 1981, adopted by a vote of twenty-nine to seven the final map (the "1981 map" or "City Council map"), which provided for twenty-four white majority wards, seventeen black majority wards, four Hispanic majority wards and five wards with no majority group (Stips. 105–106). Several alternative maps had been proposed but had received relatively little consideration. In addition, the City Council under Chicago's Home Rule powers passed an ordinance requiring

that seventeen, rather than ten, aldermen must vote against a redistricting ordinance before a substitute ordinance could be submitted to a public referendum. ILL.REV. STAT. ch. 24 § 21–39 (1981); Stip. 100.

In the summer of 1982, three groups of plaintiffs filed voting rights complaints, including a group of nine black voters of the City of Chicago (the *Ketchum* plaintiffs), a group of six Hispanic voters of the City of Chicago (the *Velasco* plaintiffs) and another group of four individuals and a black political organization (the Political Action Conference of Illinois). The defendants in each case were Jane Byrne, Mayor of the City of Chicago; Martin R. Murphy, Commissioner of the Department of Planning of the City of Chicago; Thomas E. Keane, former alderman of the 31st Ward; the City Council of the City of Chicago and the Board of Election Commissioners of Chicago. The three suits were consolidated for all purposes and another group of five voters from the 42nd and 43rd Wards (the *Pillman* plaintiffs-intervenors) and the United States were granted leave to file intervening complaints. Neither the United States nor the *Pillman* plaintiffs are involved in this appeal. The individual defendants, Byrne, Murphy and Keane, were dismissed at the end of plaintiffs' case (Tr. 2448–55), and that dismissal has not been appealed.

The trial lasted from October 9 through December 7, 1982. On December 21, 1982, District Judge Thomas R. McMillen delivered an oral opinion from the bench. The court rejected plaintiffs' fourteenth and fifteenth amendment claims finding that the motivation for the adoption of the 1980 redistricting map by the City Council "was not based on the intent or purpose of discriminating against any minority group," but, rather, the reason "was to preserve the incumbencies of those members of the City Council who were voting on the map" (Tr. 4083). The court did, however, find a violation of section 2 of the Voting Rights Act, as amended in 1982, because the "total result" of the map was "unfair" and ordered the defendants to draw a new map revising four wards, although in fact seven wards were changed in the court-approved

map. Tr. 4107, 4112–13. On December 23, 1982, defendants presented their revised map, which the court adopted on December 24, 1982, over objections of the black and Hispanic plaintiffs. Plaintiffs presented a motion for modification which was denied on May 12, 1983.

Plaintiffs alleged, as they now argue on appeal, that the City Council map caused dilution in minority voting strength through four techniques—fracturing, packing, retrogression and boundary manipulation. The trial court, however, rejected most of these claims (Tr. 4100–05) and found the City Council map unfair only in that it caused retrogression from the nineteen majority black wards in 1980 under the 1970 map to seventeen majority black wards under the new 1981 map.[2] It therefore ordered that a black majority be restored to the 37th and 15th Wards (Tr. 4107). The court also determined that there should be four majority and one plurality Hispanic wards (Tr. 4112–13).

Several important principles underlying the district court's decision should be re-emphasized. First, the district court held that protection of incumbencies—even when accomplished by purposeful manipulation of the racial composition of the voting unit—does not constitute deliberate discrimination. Second, in determining a section 2 violation, the district court said that only the overall city map and, in particular, only retrogression on a "city-wide scale" need be examined; the situation within particular wards and "retrogression" in the size of a majority within individual wards need not be considered. Such phenomena as packing, fracturing and boundary manipulation were also deemed to require no consideration. Third, the district court said that voting age population rather than total population figures should be utilized in determining the relative racial composition of a ward for remedial purposes. Fourth, the court found that a simple majority (i.e., more than 50%) of voting age population is the only criterion to be used in determining whether a particular minority has a reasonable opportunity to elect a candidate of its choice.

On appeal, plaintiffs-appellants have requested that we order the district court to devise a new map which remedies the alleged dilution of minority voting strength through manipulation, packing, fracturing and retrogression within individual wards and which adopts a 65% minority population guideline for remedial purposes, whenever possible. In addition, appellants urge that we instruct the trial court to enter a

---

**2.** "Retrogression" may be defined as a decrease in the new districting plan or other voting scheme from the previous plan or scheme in the absolute number of representatives which a minority group has a fair chance to elect. See *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976); *Rybicki v. State Board of Elections of the State of Illinois*, 574 F.Supp. 1082, 1108–09 and nn. 74 & 75 (N.D.Ill.1982) (three-judge panel) ["*Rybicki I*"]. Here, the term refers to a reduction in the number of wards with an effective majority of the relevant minority group from the number of such wards which existed immediately before the redistricting plan was instituted. The circumstances of retrogression suggest a shortfall in minority representation below what would have been anticipated based on changes in overall population proportions. To correct retrogression does not necessarily (or usually) imply the achievement of proportional representation. *Beer v. United States*, 425 U.S. at 141, 96 S.Ct. at 1363 (reapportionment plan which does not provide proportional representation for blacks does not violate nonretrogression rule as long as blacks can elect as many black representatives

as was possible under the previous plan). See also *City of Lockhart v. United States*, 460 U.S. 125, 103 S.Ct. 998, 1003, 74 L.Ed.2d 863 (1983) (adopting *Beer* analysis that section 5 preclearance could be granted as long as the new plan "did not increase the degree of discrimination against blacks"); Howard and Howard, *The Dilemma of the Voting Rights Act—Recognizing the Emerging Political Equality Norm*, 83 Colum.L. Rev. 1615, 1622–23 n. 29 (1983) [*The Dilemma of the Voting Rights Act*]. Rather, the nonretrogression rule requires the maintenance of representation at roughly the same level as was formerly achieved. The application of the nonretrogression rule in the instant case, where the population of Chicago is declining but the number of wards remains constant, may be more clearly defensible than where the city population is falling and the number of election districts (such as state or congressional representative districts) assigned to the city is also declining. In the latter situation, a retrogression analysis may (but does not necessarily) overstate the minority claim. See, e.g., *Rybicki I*, 574 F.Supp. at 1108–09.

finding of intentional discrimination in violation of the fourteenth amendment against blacks and Hispanics in the drawing of the City Council map.[3]

## II

### The 1982 Voting Rights Act Amendment

■ The Voting Rights Act, 42 U.S.C. § 1973, was amended and extended in June 1982. Under the previous version of section 2 of the Voting Rights Act, which had been judicially construed to parallel the fifteenth amendment, a violation could be found only if the discrimination were found to be intentional. *City of Mobile v. Bolden,* 446 U.S. 55, 60–61, 100 S.Ct. 1490, 1495–96, 64 L.Ed.2d 47 (1980). The most significant change brought about by the 1982 amendments was to eliminate the requirement of *intentional* discrimination by substituting a "results" test for the "purpose" test imposed by the Supreme Court and by listing the factors to be considered in determining whether on the basis of the "totality of circumstances" the Act has been violated.[4]

In *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a plurality of four Justices had held that, in order to establish a violation of the fifteenth amendment, a "racially discriminatory motivation" must be established. *Id.* at 62, 100 S.Ct. at 1497. Similar proof of intent was required to establish a violation of the equal protection clause of the four-

teenth amendment in racial vote dilution cases. *Id.* at 66, 100 S.Ct. at 1499. The plurality opinion of the Supreme Court also concluded that, because Congress intended section 2 of the pre-1982 Voting Rights Act to track the fifteenth amendment, section 2 also required proof of discriminatory intent. *Id.* at 60–61, 100 S.Ct. at 1495–96. The relevant legislative history of amended section 2 expressly states that it was intended to replace the *Bolden* intent requirement with a "results" standard. Congress intended that, "[i]f the plaintiff proceeds under the 'results test', then the court would assess the impact of the challenged structure or practice on the basis of objective factors, rather than making a determination about the motivations which lay behind its adoption or maintenance." S.Rep. No. 417, 97th Cong., 2d Sess. 27 (1982) ["Senate Report"], *reprinted in* 1982 U.S.Code Cong. & Ad.News 177 *et seq.,* 205.

The standard for determining a section 2 violation was indicated in the legislative history as follows:

New Subsection 2(b) delineates the legal analysis which the Congress intends courts to apply under the "results test." Specifically the subsection codifies the test for discriminatory result laid down by the Supreme Court in *White v. Regester* .... 412 U.S. 755, at 766, 769 [93 S.Ct. 2332, at 2339, 2341, 37 L.Ed.2d 314]. The courts are to look at the totality of the circumstances in order to deter-

---

**3.** Appellants also challenge the sufficiency of the district court's oral opinion purporting to constitute findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure. In light of our holding on this appeal, it is not necessary to address this issue.

**4.** Section 2 as amended states:
   (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
   (b) A violation of subsection (a) of this section is established if, based on the totality of

circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
42 U.S.C. § 1973 (1982).

mine whether the result of the challenged practice is that the political processes are equally open; that is, whether, members of a protected class have the same opportunity as others to participate in the electoral process and to elect candidates of their choice. The courts are to conduct this analysis on the basis of a variety of objective factors concerning the impact of the challenged practice and the social and political context in which it occurs.

Senate Report at 67 (footnote omitted). Plaintiffs, therefore, need only show "that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process." *Id.* at 27.

The legislative history and subsequent judicial interpretation of the 1982 amendments clearly demonstrate that claims of

vote dilution come within the scope of the Act. Senate Report at 30 n. 120; *Rybicki v. State Board of Elections of the State of Illinois,* 574 F.Supp. 1147, 1148 (N.D.Ill. 1983) (three-judge panel) [*"Rybicki II"*]. As stated in *Rybicki II,* it is clear that the amendments are intended to apply to redistricting plans and that their application to a current redistricting plan poses no problems of retroactivity because such application is in fact prospective to the elections to be held during the next decade. *Rybicki II,* 574 F.Supp. at 1148 n. 3; *Major v. Treen,* 574 F.Supp. 325, 341–42 n. 20 (E.D. La.1983) (three-judge panel).

In order to determine whether a suspect election structure or practice constitutes a violation of section 2 under the "results" test and in order to remain faithful to Congress' express intent, we should attempt to apply the factors set forth in Congressional Committee reports.[5] These

**5.** The report of the Senate Judiciary Committee listed "typical factors" as including:

 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

 2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

 6. whether political campaigns have been characterized by overt or subtle racial appeals;

 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

 Additional factors that in some cases have had probative value as part of the plaintiffs' evidence to establish a violation are:

 whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

 whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

 While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution.

 The cases demonstrate, and the Committee intends that there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other.

Senate Report at 28–29 (footnotes omitted). The Subcommittee on the Constitution of the Senate Judiciary Committee enumerated a partial list of twenty "objective factors" gleaned from various sources, including:

 (1) some history of discrimination; (2) at-large voting systems or multi-member districts; (3) some history of "dual" school systems; (4) cancellation of registration for failure to vote; (5) residency requirements for voters; (6) special requirements for independent or third-party candidates; (7) off-year elections; (8) substantial candidate cost requirements; (9) staggered terms of office; (10) high economic costs associated with registration; (11) disparity in voter registration by race; (12) history of lack of proportional representation; (13) disparity in literacy rates by race; (14) evidence of racial bloc voting;

factors were derived from *White v. Reges-ter*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the leading pre-*Bolden* Supreme Court case, and *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). *Zimmer* articulated the aggregate of factors upon which a claim of vote dilution might be based. 485 F.2d at 1305–07. *White v. Regester,* which affirmed a district court decision declaring invalid multi-member districts in Dallas and Bexar Counties, Texas, relied on evidence of traditional racially exclusionary practices (such as use of a poll-tax and exclusion of blacks from the Democratic Party primary process) and of certain other historical and socio-economic factors or circumstances. These circumstances included the failure of the Democratic Party to "exhibit good-faith concern for the political and other needs and aspirations of the Negro community," use of racial campaign tactics to defeat candidates with black support and the fact that only two blacks had been elected to the Texas House of Representatives from Dallas County since Reconstruction. 412 U.S. at 767, 93 S.Ct. at 2340. The district court thus found that the black community was "generally not permitted to enter into the political process in a reliable and meaningful manner." *Id.*

The approach which the *White v. Regester* Court utilized in analyzing the historical circumstances of the Hispanic community of Bexar County (containing the City of San Antonio) is perhaps more directly applicable to our case. The Supreme Court considered the effect on political participation of discrimination in education, employment, economics, health and other areas. *Id.* at 768, 93 S.Ct. at 2340.

It is important to recognize that the circumstances identified in *White v. Regester* were thought to be useful in characterizing a system utilizing multi-member election districts. In a case where lines are drawn to establish discrete electoral units and to distribute racial and ethnic populations among districts, the ways in which these lines are drawn may become independent indicia of discriminatory intent or result. Such "direct" factors in the drafting process of individual districts may augment or even take the place of the *White v. Regester* "background" factors which indicate the historical or sociological climate of an entire county or other political unit. *See also Major v. Treen,* 574 F.Supp. at 342–43 n. 22.

The political situation in the City of Chicago is obviously somewhat different from that addressed in *White v. Regester.* The sorts of discrimination in politics and in governmental contexts which have been alleged (and in some cases proven in court) in Chicago have been less open and notorious than what was historically the case in Dallas and Bexar Counties in Texas. Elected officials and the Democratic Party in Chicago have over the years been somewhat more responsive to black and Hispanic concerns, and in Chicago numerous black public officials, including aldermen, state senators and representatives, U.S. representatives and now the Mayor have been elected.

However, adverse social and economic circumstances involving discrimination, depressed socio-economic conditions, lower income, housing and school segregation, and traditionally low voter registration and turn-out have existed for the black and Hispanic communities in Chicago. *Rybicki II,* 574 F.Supp. at 1151–52. In addition, employment or other forms of discrimination have been alleged or proven in such city units as the Chicago Police Department, the Chicago Housing Authority, the Chicago Board of Education, the Chicago Public Library and the Chicago Park Dis-

(15) history of English-only ballots; (16) history of poll taxes; (17) disparity in distribution of services by race; (18) numbered electoral posts; (19) prohibitions on single-shot voting; and (20) majority vote requirements. Senate Report at 143–44 (footnotes omitted). In *Rogers v. Lodge,* 458 U.S. 613, 623–27, 102 S.Ct.

3272, 3278–80, 73 L.Ed.2d 1012 (1982), the Supreme Court approved a finding of intentional discrimination based upon an analysis of factors similar to those discussed in the legislative history of amended section 2 and those considered in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

trict. *Rybicki v. State Board of Elections of the State of Illinois*, 574 F.Supp. 1082, 1120–21 (N.D.Ill.1982) (three-judge panel) ["*Rybicki I*"]. While blacks have been represented in the City Council, the Hispanic community has not, having elected no alderman between 1920 and 1980. Stip. 117. In *Puerto Rican Organization for Political Action v. Kusper*, 350 F.Supp. 606, 611 (N.D.Ill.1972), *aff'd*, 490 F.2d 575 (7th Cir. 1973), the district court issued an injunction requiring the preparation and distribution of certain election materials in Spanish in order to protect the right to vote of Spanish-speaking individuals. Finally, we note that the three-judge *Rybicki* court found intentional discrimination in the redistricting plan, based on the 1980 census, of certain state legislative districts in Chicago. *Rybicki I*, 574 F.Supp. at 1108–12.

The district court, in the case before us, rejected plaintiffs' claims of a section 2 violation based on dilution of minority voting strength through packing and fracturing of minority communities. Instead it found that these practices were the result of severe housing segregation of the black community in certain areas and the incumbent aldermen's desire to protect their incumbencies (Tr.4102). The court did, however, find a section 2 violation, not on the basis of purposeful discrimination, but on the basis of the retrogression in the 1981 map in the number of wards with a black majority population. We approve this finding of a section 2 violation based on retrogression and on the manipulation of racial voting populations to achieve retrogression.

## III

### Intentional Discrimination

■ Appellants also ask us to reverse the trial court's determination that there has been no fourteenth amendment violation. In order to establish such a violation, we would be required to find that the City Council had intentionally discriminated against minorities under the criteria set out in *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The Supreme Court there stated in its plurality opinion that, in order to prove a claim of voting strength dilution, the "plaintiff must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial ... discrimination.'" 446 U.S. at 66, 100 S.Ct. at 1499 (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149, 91 S.Ct. 1858, 1872, 29 L.Ed.2d 363 (1971)). It is not, however, necessary for a plaintiff to demonstrate that discriminatory purpose is the only underlying motivation for the challenged redistricting plan as long as it is one of the motives. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Rybicki I*, 574 F.Supp. at 1106–07.

In *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), the Supreme Court retreated somewhat from the plurality position in *Bolden* without actually overruling *Bolden*. In *Rogers*, the Court affirmed the district court's finding of intentional discrimination based on indirect and circumstantial evidence and endorsed its reliance on a "totality of the circumstances" approach. *Id.* at 622–27, 102 S.Ct. at 3278–80. The factors cited in *Rogers* as relevant to a determination of discriminatory intent include bloc voting along racial lines; low black voter registration; exclusion from the political process; unresponsiveness of elected officials to needs of minorities, and depressed socio-economic status attributable to inferior education and employment and housing discrimination. *Id.* *See also Buchanan v. City of Jackson*, 708 F.2d 1066 (6th Cir. 1983) (district court decision remanded for reconsideration in light of amended section 2 of the Voting Right Act and *Rogers v. Lodge* which recognized that discriminatory purpose can be based on circumstantial evidence including the *Zimmer* factors); *Buskey v. Oliver*, 565 F.Supp. 1473, 1481 (M.D. Ala.1983) (discriminatory result may be established by several relevant "circumstantial factors" enumerated in the pre-*Bolden* cases, *White v. Regester* and *Zimmer v. McKeithen*); Note, *The Constitutional Significance of the Discriminatory Effects of At-Large Elections*, 91 YALE L.J. 974, 978–81 (1982).

The district court in the case before us found that protection of incumbent alder-

men was the motivation underlying the City Council redistricting plan. Yet several other factors, similar to those which led the court in *Rybicki I* to conclude that intentional discrimination was present in the legislative redistricting plan, are strong evidence of intentional discrimination here as well. First, there is the retrogression, in the context of a substantial increase in the percentage of blacks in the population, from nineteen majority black wards in 1980 under the 1970 map to seventeen majority black wards under the 1981 City Council map. *Supra* n. 2; *Rybicki I*, 574 F.Supp. at 1108–09. *See also City of Rome v. United States*, 446 U.S. 156, 185, 100 S.Ct. 1548, 1565, 64 L.Ed.2d 119 (1980) (electoral changes cannot be permitted which lead to retrogression in the position of racial minorities in the exercise of their electoral rights); *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976) (retrogression in the position of racial minorities is not permitted under the Voting Rights Act); *Buskey v. Oliver*, 565 F.Supp. 1473, 1482 (M.D.Ala.1983) (retrogression may constitute unlawful vote dilution under amended section 2 of the Voting Rights Act); *City of Port Arthur, Texas v. United States*, 517 F.Supp. 987, 1022 (D.D.C.1981) (three-judge panel), *aff'd*, 459 U.S. 159, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982) (reduction of black voting strength indicates "invidious motive" in action for de-

claratory relief under section 5 of the Voting Rights Act); *Hale County, Alabama v. United States*, 496 F.Supp. 1206, 1218 (D.D.C.1980) (three-judge panel) (retrogressive effect of changes in voting scheme supports inference of discriminatory purpose in action brought under section 5 of the Voting Rights Act).[6]

Second, discrimination may be identified in the manipulation of certain ward boundaries to adjust the relative size of racial groups in the City Council map. For example, before the 1981 redistricting, four wards—the 7th, 15th, 18th and 37th Wards—had populations in excess of the 60,101 required under the redistricting plan. Population therefore had to be moved out of those wards in order to accomplish the redistricting mandate. Three of the four wards had strong, but not overwhelming, black majorities. The fourth ward (the 18th) had a strong black plurality. In order to accomplish the required redistribution of population, however, blacks were moved out of these wards in much greater numbers than their proportion of the population and in greater numbers than required to accomplish the necessary reduction. Additional people, comprising a mix of blacks and non-minorities, were then moved into these wards to make up the deficit with a resulting sharp reduction in the proportion of blacks in those wards. This process is illustrated by the following chart:

| Ward | 1970 Map | % Black | Total Moved Out | % Black | Total Moved In | % Black | Oct. Map | % Black |
|---|---|---|---|---|---|---|---|---|
| 7 | 69,521 | 62.6 | 14,176 | 93.7 | 5,002 | 66.6 | 60,347 | 55.6 |
| 15 | 72,255 | 66.4 | 17,847 | 96.5 | 5,846 | 0.0 | 60,254 | 51.0 |
| 18 | 61,409 | 49.3 | 10,729 | 98.6 | 9,440 | 85.6 | 60,120 | 46.2 |
| 37 | 77,394 | 76.4 | 40,035 | 96.2 | 23,149 | 1.4 | 60,508 | 34.5 |

*See* Appellants' brief at 21; Defendant's Exhibit 1I, Appendix A to Brief of Defendant-Appellee, The City Council of the City of Chicago [Def.Ex.].

This very practice was identified in the *Rybicki I* opinion, where it was found to

constitute manipulation designed to dilute minority voting strength. In *Rybicki I* in several legislative districts, large numbers of blacks were moved out, whites moved in, and the excluded blacks "packed" into a district with an unnecessarily high propor-

---

**6.** Retrogression causing erosion in the relative voting strength of minorities is often an issue in cases brought under section 5 of the Voting

Rights Act. *See The Dilemma of the Voting Rights Act, supra* n. 2, at 1622–23 n. 29.

tion of blacks and with a resulting "waste" of black votes. *Rybicki I*, 574 F.Supp. at 1111–12.[7] Examples of "fracturing," in which blacks are moved out of black majority wards and into white majority wards where they would constitute a sizeable but politically ineffective minority, were also identified.[8] *Rybicki I*, 574 F.Supp. at 1109–11.

In *Rybicki I*, the three-judge court found that these practices of manipulation, packing and fracturing were the product of an intent to preserve the incumbencies of various white legislators. Nevertheless, the court said:

> It may, of course, be argued that this manipulation of racial populations in the district was accomplished for the purpose of maintaining the incumbency of a white Senator and was not necessarily indicative of an intent to discriminate against blacks *qua* blacks. We believe, however, that under the peculiar circumstances of this case, the requirements of incumbency are so closely intertwined with the need for racial dilution that an intent to maintain a safe, primarily white, district for Senator Joyce is virtually coterminous with a purpose to practice racial discrimination.

*Id.* at 1109. The court in *Rybicki I* recognized that adjustments of legislative districts merely to preserve incumbencies, where large shifts and manipulation of racial populations were not evident, would not necessarily amount to purposeful racial discrimination. *Id.* at 1110–11 n. 81. *See Burns v. Richardson*, 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295 n. 16, 16 L.Ed.2d 376 (1966) ("The fact that district boundaries may have been drawn in a way that mini-

mizes the number of contests between present incumbents does not in and of itself establish invidiousness."); *McMillan v. Escambia County, Florida*, 638 F.2d 1239, 1245 (5th Cir.) ("the desire to retain one's incumbency unaccompanied by other evidence ought not to be equated with an intent to discriminate against blacks *qua* blacks"), *cert. dismissed sub nom. Jenkins v. City of Pensacola, Florida*, 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981), *vacated in part*, 688 F.2d 960 (1982), *vacated and remanded*, —— U.S. ——, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984). Nonetheless, the court found in *Rybicki I* that the evidence of dilution of minority voting strength by manipulation, fracturing and packing established intentional racial discrimination in the redistricting plan because racial discrimination was the necessary accompaniment of the action taken to protect incumbencies. Since it is frequently impossible to preserve white incumbencies amid a high black-percentage population without gerrymandering to limit black representation, it seems to follow that many devices employed to preserve incumbencies are necessarily racially discriminatory. We think there is little point for present purposes in distinguishing discrimination based on an ultimate objective of keeping certain incumbent whites in office from discrimination borne of pure racial animus.

We have discussed above several examples of the dilution of minority voting strength through manipulation of ward boundaries. Appellants have alleged instances of packing (the "wasting" of black votes through unnecessary concentration, *supra* n. 7), in that fourteen of the seven-

---

**7.** Districts with a black majority greater than 65%–70% (the percentage considered necessary to ensure blacks a reasonable opportunity to elect candidates of their choice) may evidence "packing." In such cases, the excessive concentration of black population may be viewed as "wasting" minority voting power and unnecessarily minimizing minority effectiveness in other districts. *See The Dilemma of the Voting Rights Act, supra* n. 2, at 1662–63 n. 194.

**8.** Fracturing is the process by which a minority group which could form a sizeable majority in one district is split into two or more districts

where the minorities constitute an ineffective political grouping in each district. *See also infra* n. 9; *Gingles v. Edmisten*, 590 F.Supp. 345, 355 (E.D.N.C.1984) (three-judge panel), *appeal docketed*, 52 U.S.L.W. 3908 (U.S. June 2, 1984) (No. 83–1968) ("Vote dilution in the *White v. Regester* sense may result from the fracturing into several single-member districts as well as from the submergence in one multi-member district of black voter concentrations sufficient, if not 'fractured' or 'submerged,' to constitute an effective single-member district voting majority").

teen majority black wards have black populations in excess of 89%, while only six majority white wards have majorities at comparable levels. Appellants' brief at 31. There are also allegations of fracturing of the black communities on both the West and the South Sides, so that certain black population, which could have been used to form additional black majority wards, was instead split off to form sizeable black minorities within white majority wards.[9]

The Hispanic communities also allegedly were fractured. We, of course, recognize that the Hispanic population is generally more dispersed than is the black and that it is therefore usually more difficult to create wards with a significant Hispanic majority. *See generally* Note, *Alternative Voting Systems as Remedies for Unlawful At-Large Systems*, 92 YALE L.J. 144, 146 n. 16 (1982). Still, fracturing can, and ostensibly has, occurred. Appellants claim that the Northwest Side Hispanic community was split among six wards (the 26th, 30th, 31st, 32nd, 33rd and 35th Wards) with Hispanic populations in these various wards ranging from 24.1% to 57.3%. On the Southwest Side, the Hispanic community of Pilsen was split into two wards (the 1st with 30.7% and the 25th with 52.6% Hispanic population) instead of being left intact, as it might have been, as one ward with an Hispanic population of 72.9%. In addition, the Little Village community, which could have been left entirely within the 22nd Ward with an Hispanic population of 78.8%, was split between the 12th and 22nd Wards with 32%

and 64.3% of the total population, respectively. Appellants' brief at 25–26.

Despite these considerable indications of minority voting strength dilution through manipulation, packing and fracturing, which in *Rybicki I* were (we think correctly) held to constitute intentional racial discrimination, we think it is unnecessary to make a formal finding that the 1981 City Council map constitutes intentional racial discrimination. At the time of the *Rybicki I* decision, the finding of remediable vote dilution depended on a determination of intentional discrimination. As noted previously, the 1982 amendments to the Voting Rights Act have eliminated the requirement of intentional discrimination and relief can be afforded on the basis of a finding of resultant discrimination. This change in the law appears to reflect congressional impatience with the inherently speculative process of ascribing purposes to government actions involving the complex interaction of numerous individuals and conflicting interests. We think it undesirable to undertake this difficult analysis when Congress has rendered it superfluous by amending the Voting Rights Act. Congress, in amending the Voting Rights Act, wisely eliminated the elusive and perhaps meaningless issue of governmental "purpose" from the calculus of vote dilution claims. *See also Major v. Treen*, 574 F.Supp. at 346. There appears to be no difference in the practical result or in the available remedy regardless of how the

9. *Supra* n. 8. Plaintiffs' expert witness, Dr. Hofeller, testified at trial as follows:

In the construction of the 1981 wards overlay, ... there are instances in which the predominantly white wards come in and fracture the black communities. You see this in Ward 18, Ward 15, Ward 14, Ward 11, Ward 1, Ward 37 and to some extent Ward 42. Nowhere on the map do you see a compensating reach of a black ward out across the boundary of the neighborhood into the white areas. In this way there could not help but be less black wards created than would be warranted by the population of the black neighborhood. Tr. 921–22; *see also* Tr. 235 (testimony of Martin R. Murphy identifying fracturing in the 11th, 14th, 18th, 19th, 37th and 22nd Wards).

Another plaintiffs' expert witness, Dr. Philip Hauser, conducted various statistical analyses to

demonstrate the disproportionate effect of fracturing on the white, as opposed to black and Hispanic, population. According to his calculations, the odds of a black being placed in a majority-white ward were 4.47 times as great as the odds of a white being placed in a majority-black ward. If only those wards located along the "borders" between the white and black communities are considered, then blacks in those wards were 33.67 times as likely to be placed in majority-white wards. In both situations (because virtually all Hispanics live in border areas), the odds are 88.68 times as great that an Hispanic would be placed in a majority-white ward as that a white would be placed in a majority-Hispanic ward. Appellants' brief at 27–31; Plaintiffs' exhibits 171, 172, 193, 199, 205; Tr. 742, 779.

resulting discrimination is characterized.[10] We therefore shall not explicitly decide the issue of a fourteenth amendment violation despite the apparent close analogy between certain of the facts here and certain of those in *Rybicki I.*[11]

## IV

### Remedy

■ Having found that the City Council map resulted in racial discrimination and therefore violated section 2 of the Voting Rights Act, the district court ordered the drafting of a new map. The sole basis for the district court's finding of a violation was the city-wide retrogression based on a comparison of the number of black and Hispanic majority and plurality wards in 1980 under the 1970 map with the number of such wards under the 1981 map. *Supra* n. 2. The guidelines established by the district court for the redrawing of the map therefore consisted primarily of restoring

blacks to a simple majority of the voting age population in nineteen (instead of seventeen) wards, the two affected wards being the 37th and 15th (Tr. 4107). The district court also determined that the Hispanics should have four majority wards and one plurality ward (Tr. 4111).[12] The respective compositions of the 22nd, 25th and 31st Wards were considered satisfactory, but the district court ordered adjustments in the 26th and 32nd Wards (Tr. 4112–13).

Perhaps the most significant aspect of the district court's remedy formulation was its determination of what constitutes an effective majority for a minority group within a particular ward. The test of an effective majority is that share of the population required to provide minorities with "a realistic opportunity to elect officials of their choice ...." *Kirksey v. Board of Supervisors of Hinds County,* 402 F.Supp. 658, 676 (S.D.Miss.1975), *aff'd,* 528 F.2d 536 (5th Cir.1976), *rev'd,* 554 F.2d 139 (5th Cir.) (en banc), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977).[13] In

---

**10.** Plaintiffs assert that if intentional discrimination is found, they will be able to seek additional relief under section 3(c) of the Voting Rights Act. Section 3(c) provides that, if a fourteenth or fifteenth amendment violation is found,

> the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and ... no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that [it] does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 1973b(f)(2) of this title....

42 U.S.C. § 1973a(c) (1982). Because we believe that continuing court jurisdiction of the redistricting requirements for the aldermanic wards would be neither necessary nor appropriate under these circumstances, the relief actually available to plaintiffs in this case is the same regardless of whether we reach the issue of intentional discrimination. Obviously, a constitutional analysis would be required if relief under section 3(c) were in question. We note, in addition, that the Supreme Court has recently declined to consider the constitutional basis for a challenge to an electoral system when an affirmance on the alternative statutory ground based on amended section 2 would moot the constitutional issues presented in the case. *Es-*

*cambia County v. McMillan,* —— U.S. ——, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984).

**11.** Because we do not decide the question of intentional discrimination, it is also not necessary for us to consider the complex burden of proof questions presented by the alternative modes of analysis available in proving intentional discrimination in cases involving mixed motive discussed at some length in *Rybicki I,* 574 F.Supp. at 1106–08. *See, e.g., Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (use of a two-step analysis in which, once plaintiff shows a discriminatory purpose was one factor in the challenged action, the burden of proof shifts to defendant to show the same result would have occurred absent the discriminatory purpose); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (use of a three-step analysis in which the burden of proof shifts back to the plaintiff to demonstrate that the defendant's purported explanation is merely a pretext for intentional discrimination).

**12.** We note that a retrogression analysis applied to a minority which had no prior elected representation seems less clearly appropriate than as applied to a minority having a previous history of representation. We think, however, that the district court's determination of liability with respect to the Hispanic wards is correct.

**13.** In more practical terms, an effective majority means "a majority of the population substantial

the case before us, the district court adopted the use of voting age population statistics as the fairest and most equitable criterion for minority group strength in the evaluation of a redistricting plan under section 2 (Tr. 4106). The district court rejected for most wards the use of any majority greater than 50% of voting age population as a threshold for determining an effective majority of blacks or Hispanics. In some of the Hispanic wards the court did set a higher figure to correct for the relatively high number of non-citizens. In rejecting the general use of a greater than 50% majority of voting age population, the court stated:

> there is no statistical or objective evidence in the record that a minority is entitled to or should have more than a majority of the voting age population in order to have a reasonably fair opportunity to vote for candidates of their choice or even to elect candidates of their choice.

Tr. 4109. The district judge also relied on testimony of defendants' expert witnesses that minority groups will register and vote in sufficiently large numbers when the proper incentives are present and that "[i]ntelligence or economic standings in the community" are variables which are statistically unsupported in the record and should not be considered. The district judge therefore chose to

> disregard and discard the rule of thumb that has been talked [sic] by various witnesses that 65 percent of a minority is necessary in order to control a ward or, to put it another way, to give the voters in that ward a fair opportunity to vote for a candidate of their choice.

Tr. 4110–11.

Following the district court's finding of liability, the defendants were thus ordered to draft a new map in accordance with the criticisms and guidelines as articulated by the court, and the district court subsequently approved this map. The only significant changes in this new map for the black community were the restoration of black majorities in two wards, as follows:

| Ward | 1970 Map | City Council Map | Court-approved Map |
|---|---|---|---|
| 15 | 66.36 (59.99)[14] | 41.69 (34.59) | 60.09 (52.6) |
| 37 | 76.39 (72.42) | 36.84 (31.21) | 61.65 (56.2) |

Appellants' brief at 47; Def. Exs. 1I, 7I and 261I. The court-approved map shows the following changes for the Hispanic wards:

| Ward | 1970 Map | City Council Map | Court-approved Map |
|---|---|---|---|
| 22 | 62.8 (56.7) | 64.88 (59.88) | 75.55 (69.0) |
| 25 | 51.1 (44.9) | 52.56 (46.19) | 65.37 (59.5) |
| 26 | 50.7 (41.9) | 52.34 (43.68) | 58.83 (50.0) |
| 31 | 53.6 (48.4) | 57.26 (52.41) | 57.38 (50.6) |
| 32 | 47.9 (40.2) | 47.23 (39.59) | 46.3 (38.8) |

Appellants' brief at 48; Def. Exs. 1I, 7I and 261I. In the court-approved map, the Hispanics have, as the above table indicates, only 50% of voting-age population in

---

enough to allow group choice to be effective." In the case of minority groups, the "minority must constitute more than half of a district's population in order to obtain an effective electoral majority." Note, *Alternative Voting Systems as Remedies For Unlawful At-Large Systems,* 92 YALE L.J. 144, 146 n. 13 (1982) [*Alternative Voting Systems* ]. *See also White v. Regester,* 412 U.S. at 766, 93 S.Ct. at 2339; *Whitcomb v. Chavis,* 403 U.S. at 149–50, 91 S.Ct. at 1872; *Zimmer v. McKeithen,* 485 F.2d at 1304–05

("where the petitioner can demonstrate that 'its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice,' ... such districting schemes are constitutionally infirm") (quoting *White v. Regester,* 412 U.S. at 766, 93 S.Ct. at 2339).

**14.** The figures in parenthesis are percentages of voting age population ("VAP"), as opposed to percentages of total population ("TP").

the 26th Ward, although in that ward the court had ordered defendants to provide a population "in the vicinity of a 55 percent majority ... to accommodate the fact that many of them [Mexicans] are not citizens and haven't had a chance to become citizens" (Tr. 4112–13). The court had also suggested a 54% majority for Hispanics in the 32nd Ward (Tr. 4113), but the court-approved map provides for only 38.8%. Finally, the 31st Ward, which was to have no change according to the trial judge (Tr. 4113), has a reduction from 52.41% to 50.6% in the court-approved map.

In undertaking our review of the remedy ordered by the district court, we take note of the comments in the Senate Report concerning the 1982 amendments to the Voting Rights Act which adopt

> [t]he basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated .... The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

Senate Report at 31 (footnote omitted). The Supreme Court has stated, in reviewing a district court decree in a voting rights discrimination context, that "the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States,* 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). In *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977), the Supreme Court articulated the standard of review as

> whether the District Court properly exercised its equitable discretion in reconciling the requirements of the Constitution with the goals of state political policy.... In such circumstances, the court's task is inevitably an exposed and sensitive one that must be accomplished circumspectly, and in a manner "free

from any taint of arbitrariness or discrimination."

*Id.* at 414–15, 97 S.Ct. at 1833–34 (quoting *Roman v. Sincock,* 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620 (1964)).

Under this exacting standard, we find that the court-approved map has not provided an adequate remedy for the Voting Rights Act violation because it does not eliminate, in accordance with well-accepted principles of redistricting, the illegal dilution of minority voting strength accomplished by the City Council map. The court-approved map does not grant to minority citizens a reasonable and fair opportunity to elect candidates of their choice as that concept has been understood in redistricting jurisprudence. We must, therefore, remand to the district court for reconsideration of an adequate and appropriate remedy.

It is not, however, the proper role of this court to formulate its own redistricting plan or to dictate to a district court minute details of how such a plan should be devised. Nonetheless, we feel we must address certain issues and establish certain guidelines to assist the district court in determining a suitable remedy. These guidelines incorporate principles which the district court should carefully consider and attempt to implement. We are fully aware, however, that some deviation from recommended norms may be justified by the existence of special circumstances. Upon remand, the district court in its discretion may find it necessary to take additional evidence with respect to recent political and sociological changes which may affect our present analysis of these guidelines.

■ 1. *Use of Voting Age Population Statistics:* The district court adopted voting age population statistics as the best measure of minority voting strength. This is perfectly understandable since being of age is a legal prerequisite to voting. Because minority groups generally have a younger population and, consequently, a larger proportion of individuals who are ineligible to vote, *see infra* n. 16, courts formulating redistricting plans usually add a 5% increment to a majority based on total

population figures. When voting age population data are available and the district court accepts them as reliable, it seems reasonable for such data to be used in evaluating minority voting strength instead of merely using a standard adjustment to total population. *See City of Rome v. United States*, 446 U.S. 156, 186 n. 22, 100 S.Ct. 1548, 1566 n. 22, 64 L.Ed.2d 119 (1980) (voting age population statistics are "probative because they indicate the electoral potential of the minority community"); *City of Port Arthur, Texas, v. United States*, 517 F.Supp. 987, 1015–18 (D.D.C. 1981) (three-judge panel) (using voting age population statistics). In the case before us, a cursory examination of the voting age population figures available in the record demonstrates that the discrepancy between total population and voting age population for minority groups in the Chicago area is often greater than the 5% commonly employed to compensate for the disparity.[15] As more reliable data become available, it is not unreasonable for courts to use this data instead of employing 5% as a uniform corrective.

■ 2. *Use of a Super-Majority to Define a Majority Ward:* The district court expressly rejected the use of "super-majorities" or of any corrective to adjust for the usually lower voter registration and turn-out patterns of certain minority population groups. We believe that the district court's failure to consider carefully all of the factors which are present here as in comparable situations and which have led other courts to employ such a corrective (frequently 65% of total population or 60% of voting age population or some variation of these guidelines) was an abuse of discretion under the particular circumstances before us. We see nothing in the findings of the district court or in the record on appeal which adequately addresses the widely accepted understanding, which will be discussed in greater detail below, that minorities must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice. There is simply no point in providing minorities with a "remedy" for the illegal deprivation of their representational rights in a form which will not in fact provide them with a realistic opportunity to elect a representative of their choice.

The experience of many redistricting plans has lent weight to the understanding that some form of corrective, even beyond the use of voting age population statistics, should be employed as a guideline in defining a minority district. The record here does not demonstrate that the district court adequately considered voter registration and turn-out patterns in the Hispanic and black communities in rejecting the use of any majority greater than 50% of voting age population, and we think the district court's remedy must therefore be reconsidered. In addition and very importantly, since, before redistricting was undertaken, minority groups had achieved majorities exceeding 65% in certain key wards, the provision of super-majorities in those wards would not be inequitable.

Just as minority groups have a younger-than-average population, they also generally have lower voter registration and turn-out characteristics.[16] This is not something which can be fully rectified by good motivation and organization, although the existence of these certainly helps. Some of the problems, at least, spring from circum-

---

**15.** For example, in Ward 15, under the court-approved map, blacks constitute 60.09% of the total population but only 52.6% of the voting age population, a differential of 7.49%. In Ward 37, under the court-approved map, blacks constitute 61.65% of the total population and 56.2% of the voting age population, a differential of 5.45%. Def.Ex. 261I. The variation from the 5% figure is not great and the results may be different in other wards, but it is certainly acceptable to use actual statistics in those circumstances where they are available and reliable.

**16.** According to the 1980 census statistics, 69.7% of whites, 60% of blacks and 57.0% of Hispanics are of voting age. The percentages of individuals reporting they were registered to vote in 1980 are: whites-68.4%; blacks-60.0%; Hispanics-36.3%. The percentages of individuals reporting they had actually voted in 1980 are: whites-60.9%; blacks-50.5%; Hispanics-29.9%. Bureau Of The Census, U.S. Dept. Of Commerce, Statistical Abstract Of The United States: 1981, 25–26, 499 (1981).

stances of low income, low economic status, high unemployment, poor education and high mobility. It is only common sense that highly mobile populations are less likely to vote because, *inter alia*, of failure to meet residency requirements. In addition, as the district court actually noted in this case (Tr. 4112–13), the Chicago Hispanic population on the Near Southwest Side is composed of a significant proportion of Mexicans who have not yet had an opportunity to become citizens.[17] In recognition of this fact, the district court directed defendants to provide a majority of Hispanics in the vicinity of 55% of voting age population for the 26th and 32nd Wards, although the court-approved map in fact provides for an Hispanic population of only 50.0% and 38.8% in the 26th and 32nd Wards, respectively.

Appellants here ask that, in addressing the illegal retrogression identified by the district court, we apply to the redistricting plan an analysis based not merely on citywide retrogression but on retrogression within wards. According to this approach, any retrogression in the size of a black majority or plurality within a ward should be eliminated and the size of the minority population restored to what it was in 1980 under the 1970 map. The appellants point out that this approach has been adopted in *Moore v. Leflore County Board of Election Commissioners*, 502 F.2d 621, 624 (5th Cir.1974) (three-judge panel) (reduction of black majorities from the 69–78% range to the 55–60% range found impermissible because extent of each majority was less than in pre-redistricting plan) and *Buskey v. Oliver*, 565 F.Supp. 1473, 1482–84 (M.D. Ala.1983) (reduction of black majority within one ward from 84.2% to 68% held to constitute retrogression and a section 2

violation). In the 37th Ward, a full rectification of retrogression would mean the restoration of the pre-redistricting 76.4% black majority and, in the 15th Ward, of the 66.4% black majority. Appellants' brief at 80.

There is a certain equity in appellants' argument, but we think it is too inflexible an approach to the practical needs of redistricting. We do believe, however, that those engaged in the redistricting process must keep clearly in mind that, if the original majority is not restored, then the most relevant change is one *downward* from the pre-redistricting percentage previously achieved by the minority group rather than one *upward* from the map formulated by the City Council action, which was found to be in violation of the Voting Rights Act. From this perspective, the provision of a majority exceeding 50% of voting-age population would certainly not seem inequitable.

We next turn to a consideration of other principles or guidelines which a district court might observe in fashioning an appropriate remedy. The most important principle is that, upon remand, the district court must carefully consider and evaluate the data concerning voter registration and turn-out in the black and Hispanic communities to determine the practical need for a super-majority of the respective minority groups in order to give the minorities a reasonable and fair opportunity to elect candidates of their choice.

The district court must first gather and evaluate whatever statistical and other types of evidence are available in an effort to determine their accuracy, reliability and significance in establishing historical and recent trends in the electoral patterns of the black and Hispanic communities.[18] The district court must then determine the

---

17. The Hispanic population of the Near Northwest Side wards is apparently predominently Puerto Rican rather than Mexican; Puerto Ricans are, of course, citizens.

18. Examples of the sort of statistics which a district judge might wish to evaluate for their reliability and significance were provided by both the defendant-appellee in its rehearing petition, although not in its original briefs and argument, and by the plaintiffs-appellants in

their answer. In its rehearing petition, the defendant included a chart with data on black voter registration and turnout for the elections from 1979 to 1982. Rehearing Petition at 12. While it would be within the district court's discretion to accept, reject or utilize such statistics in a modified form, the district court would be required to explain and justify its reliance on such statistics and on the numbers on which they are based.

need, under the particular circumstances of the City of Chicago, for a corrective and, if so, the extent of the corrective, which is required to afford blacks and Hispanics a reasonable and fair opportunity to elect a candidate of their choice. The district court, following Judge McMillen's reasoning in this case, could also determine that those Hispanic wards on the Southwest Side with large admixtures of non-citizens should have their effective Hispanic majorities calculated on the basis of only those individuals who are eligible, as citizens, to vote.[19]

It, of course, remains ultimately within the discretion of the district court to determine what an appropriate corrective should be based upon analysis of election data, if such data can yield a meaningful and persuasive result. This approach, if there is enough reliable information available to support it, may yield the best determination of what is required to afford minority populations a reasonable opportunity to elect candidates of their choice. We note, however, that judicial experience can provide a reliable guide to action where empirical data is ambiguous or not determinative and that a guideline of 65% of total population (or its equivalent) has achieved general acceptance in redistricting jurisprudence.

A guideline of 65% of total population has been adopted and maintained for years by the Department of Justice and by reapportionment experts and has been specifically approved by the Supreme Court in circumstances comparable to those before us as representing the proportion of minority population reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice. This figure is derived by augmenting a simple majority with an additional 5% for young population, 5% for low voter registration and 5% for low voter turn-out, for a total increment of 15%. This leads to a total target figure of 65% of total population. Obviously if voting age population statistics are used, 5% would drop out of the formula, leaving something in the vicinity of 60% of voting age population as the target percentage. Appellants argue, in addition, that a further 5% should be allowed in at least certain Hispanic wards on the Southwest Side of largely Mexican-American composition to adjust for the numbers of noncitizens; this factor was accepted in principle by the district court although apparently not followed in practice.

During the trial, witnesses for both sides testified that 65% of total population is a widely recognized and accepted criterion in redistricting formulations. Kimball Brace, one of defendants' expert witnesses, stated:

> One of the factors that is involved in any sort of redistricting activity and in the general knowledge of an experienced redistricter is that there are some over-all criterias [sic] that have been laid down in the redistricting field and what is necessary to insure a minority district. Those were outlined at the outset in the Williamsburg case in the early 1970's. Generally it talks about a 65 percent minority population. That is derived from the 50 percent total population, adding five percent for each of the three factors that are voting age population, because minorities tend to have a lower voting age population, lower registration patterns and a lower turnout pattern.

Tr. 3665. This same witness also testified that consideration of voter turn-out and registration patterns is useful in the redistricting process in order to ensure that minorities are represented. Tr. 3664–65. One of plaintiffs' witnesses, then Congressman Harold Washington, testified that, although a 65% majority does not always ensure the election of a minority candidate, there is an historical pattern, illustrated by the 6th, 8th, 9th, 16th and 17th wards, of the election of a minority candidate once the minority population approaches the 65%–70% range within a ward. Tr. 2204.[20]

---

**19.** We approve the principle adopted by Judge McMillan that there should be an appropriate corrective for non-citizenship. We leave to the discretion of the district court on remand the specific form and magnitude of the corrective.

**20.** Another of plaintiffs' witnesses, Dr. Hauser, testified that the 65% guideline does not guarantee that a particular minority group will be able to elect a candidate of its choice in any particular circumstance (Tr. 808), and the district judge

Numerous courts have either specifically adopted or tacitly approved the use of this 65% figure. It was referred to approvingly in the recent Chicago state legislative redistricting decision, *Rybicki I*, 574 F.Supp. at 1113 n. 87, and the congressional redistricting decision, *In re Illinois Congressional Districts Reapportionment Cases*, No. 81 C 1395, slip op. at 19 (N.D.Ill. Nov. 23, 1981), *aff'd sub nom. McClory v. Otto*, 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982). The 65% figure was adopted in *State of Mississippi v. United States*, 490 F.Supp. 569 (D.D.C.1979) (three-judge panel), *aff'd*, 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980), where the court stated that

> [i]t has been generally conceded that, barring exceptional circumstances such as two white candidates splitting the vote, a district should contain a black population of at least 65 percent or a black VAP of at least 60 percent to provide black voters with an opportunity to elect a candidate of their choice.

490 F.Supp. at 575. The Supreme Court, in *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977), held that "it was reasonable for the Attorney General to conclude in this case that a *substantial* nonwhite population majority—in the vicinity of 65%—would be required to achieve a nonwhite majority of eligible voters." *Id.* at 164, 97 S.Ct. at 1009 (emphasis in original). *See also Gingles v. Edmisten*, 590 F.Supp. 345, 358–59 and n. 21 (E.D.N.C.1984) (three-judge panel), *appeal docketed*, 52 U.S.L.W. 3908 (U.S. June 2, 1984) (No. 83–1968); *The Dilemma of the Voting Rights Act, supra* n. 2, at 1615 n. 3; *Alternative Voting Systems, supra* n. 13, at 146 n. 13.

In light of these expert opinions, judicial precedents and the policy and practice of the Department of Justice in administering the Voting Rights Act, we believe that, when reliable, determinative statistics are not available, in scrutinizing a redistricting plan for fairness to minority groups, the district court should give careful consideration to the 65% figure or some variation of it. As we have indicated, of course, emerging changes in sociological and electoral characteristics of minority groups and broad changes in political attitudes may substantially alter, or eliminate, the need for a corrective. The 65% figure, in particular, should be reconsidered regularly to reflect new information and new statistical data.[21]

relied on this uncertainty, to some extent, in rejecting the use of the 65% figure. This uncertainty may be illustrated by the result of the March 1982 primary election for the new Illinois State Senate District 18, which was redrawn as a result of *Rybicki I* to include a 66% minority population. In that election black candidates were unsuccessful in their efforts to unseat the white incumbent Senator. *Rybicki II*, 574 F.Supp. at 1149 n. 4. This example illustrates that application of the 65% figure does not necessarily have the effect either of automatically disenfranchising the remaining 35% of the population or of removing from the 65% of the population the appropriate incentives to organize, register and turn-out to vote. It is still easy to lose even with a potential 65% of the vote. The 65% guideline is intended to address the electoral facts as they appear to exist now and to compensate primarily for certain electoral characteristics which cannot be changed over a short period of time. As these characteristics do change or have changed, however, judicial guidelines may have to be modified accordingly. *See also infra* n. 21 and accompanying text. In the interim, though, the combination of expert opinion and judicial precedent, which will be discussed below, suggest that we continue to employ an adequate corrective (such as the frequently cited 65%).

**21.** For example, we note that the Rev. Jesse Jackson's 1984 presidential candidacy has apparently stimulated black registration and turn-out nationally. More specific to Chicago, we understand that the November 1982 gubernatorial election in Illinois and the 1983 Chicago mayoral election indicated a marked increase in black registration and turn-out. If these and other elections should demonstrate a significant and consistent change in voting behavior in Chicago applicable to aldermanic elections, there would have to be a corresponding change in redistricting practices and legal standards, although the results of these elections may not be adequate to justify an abandonment or modification of previously accepted guidelines at this juncture. It initially remains within the discretion of the district judge, however, to determine when such a consistent and reliable pattern has emerged and when adequate and trustworthy statistics concerning minority voter registration and turn-out are available. At that juncture the application of an adequate corrective may be considered or reconsidered.

In remanding this case for reconsideration of the appropriate remedy under the principles enunciated here, we recognize that at least two black majority wards, and possibly a third, will need to be redrawn in order to eliminate the retrogression of the court-approved map. These wards are the 15th Ward, the 37th Ward and possibly the 7th Ward.[22] In the case of the 15th and 37th Wards, the adoption of a 65% guideline, for example, might be fairly viewed as a limitation on restoration of the pre-redistricting black majorities (approximately 66% and 76%, respectively). This perspective would view a super-majority in these wards as a fair antidote to retrogression rather than as an "artificial" supplement to a 50% majority. It is more difficult to determine precisely which wards in the Hispanic community will need adjustments to satisfy the appropriate criteria, but those requiring further scrutiny by the district court include the 25th, 22nd, 26th, 30th, 31st, 32nd, 33rd, and 35th Wards with possibly some attention to the 1st and 12th Wards.[23]

3. *City-wide Retrogression*: In accord with our earlier discussion of city-wide retrogression in the number of minority wards as constituting a section 2 violation, we consider that the number of wards with a minority population majority should be restored to the number which existed in 1980 under the 1970 ward map. This means nineteen black majority wards and probably four majority Hispanic wards. There is some authority that, in terms of general principles, this is not necessarily the maximum permissible remedy but instead may be nearer the minimum. *See City of Port Arthur, Texas v. United States*, 517 F.Supp. 987, 1012 n. 149 (D.D. C.1981) (three-judge panel) ("it is reasonable to fix the *minimum* level of representation under the new plan at the level achieved by the same voters under the former plan") (emphasis added). We believe, however, that the remedy we have discussed is adequate here. In any event, the precise remedy must necessarily be a matter for the discretion of the district court. Of course, certain aspects, such as the precise configuration of particular wards, are more discretionary than others.

The situation of the Hispanic population is considerably more complex than that of the black population. The Hispanic population is generally not nearly as concentrated in segregated areas as is the black population, although there are cohesive Hispanic communities such as Pilsen and Little Village which, if left intact, would form significantly high concentrations of Hispanic voters. Hispanics have occupied a much less visible role in the political process in Chicago than have

---

22. The statistics relating to blacks for the 15th and 37th Wards were previously presented. *Supra* n. 14 and accompanying text. The percentages of black population for the 7th Ward are as follows:

| 1970 Map | City Council Map | Court-approved Map |
|---|---|---|
| 62.6 (63.1) | 58.4 (58.0) | 58.4 (58.0) |

Def. Exs. 1I, 7I and 261I. The district court evidently did not require any alteration in the composition of the 7th Ward under the City Council map apparently because the 58.4% (or 58% of voting age population) black majority met its criterion for a black majority ward. Here, however, we think tentatively that the prescribed adjustment may be keyed to a restoration of the 62.6% or 63.1% of voting age population which was the black population actually achieved under the 1970 map. Under the particular circumstances applicable to the 7th Ward, there appears to be less justification for specific consideration of a goal of 65% of total population (since this figure had not been achieved under the 1970 map). However, we leave the ultimate details of this adjustment to the discretion of the district court.

23. The statistics for the Hispanic population of the latter five of these wards were previously presented. *Supra* n. 14 and accompanying text. Those for the other wards are as follows:

| Ward | 1970 Map | City Council Map | Court-approved Map |
|---|---|---|---|
| 25 | 51.1 (44.9) | 52.6 (46.2) | 65 4 (59.5) |
| 1 | 35.6 (31.5) | 30.7 (27.1) | 20.6 (18.1) |
| 22 | 62.8 (56.7) | 64.9 (59.9) | 75.6 (69.0) |
| 12 | 11.4 (9.3) | 32.0 (25.8) | 19.3 (15.7) |

Def. Exs. 1I, 7I and 261I. If, as under one arguable approach, see note 22 *supra*, correction of retrogression were keyed, or limited, to percentages actually achieved under the 1970 map, there might be some question what more can be done for the Hispanic wards on a retrogression basis. We believe, however, that the Hispanic wards may be viewed in other than a retrogression context, as will be discussed below.

blacks and, until the 1980 census, little attempt was made even to count Hispanics as a distinct ethnic minority.[24] Therefore, in order to remedy effectively discrimination against Hispanics, it seems necessary to go beyond the strict calculus of the retrogression rule by attempting to provide four Hispanic majority wards (two on the Southwest Side and two on the Northwest Side) which would have a concentration of Hispanics greater than that of any individual wards in 1980 under the 1970 map. *See supra* n. 2. Since the 1970 map apparently fractured the Hispanic community, limiting the remedy for Hispanics to their situation under the 1970 map might merely perpetuate the vote dilution of the past. Therefore, instead of merely applying the nonretrogression rule to the Hispanic population, the district court should examine whether four wards can be created, each with a sufficiently large majority of Hispanics to provide the Hispanics with a reasonable opportunity to elect candidates of their choice. Of course, neither Hispanics nor blacks have a statutory or constitutional right to proportional representation.

The appellants also allege that there are additional errors in the court-approved map and ask that we order these errors be remedied on remand. First, appellants point to their allegations of fracturing of the black and Hispanic communities and ask that "some or all of the wards that touch the black-white border" be redrawn as well as many of the Hispanic wards. Appellants' brief at 79–80. Second, as previously discussed, appellants ask that retrogression within individual wards be remedied, including the restoration, for example, of the 49.37% plurality in the 18th Ward, as well as the full restoration of the pre-redistricting majorities in the 37th, 15th and 7th Wards.

We, however, believe that this attempt to rectify retrogression "within wards," in the particular circumstances of this case, is unjustified. We believe there is no vested right of a minority group to a majority of a particular magnitude unrelated to the provision of a reasonable opportunity to elect a representative under well-recognized principles. In addition, provision of majorities exceeding 65%–70% may result in packing. The mandate of section 2 of the Voting Rights Act is that minorities must be given a reasonable and fair chance to elect candidates of their choice. As previously stated, expert opinion and judicial precedent indicate that the 65% guideline (or a statistically supportable alternative corrective) is adequate to ensure this reasonable opportunity. The use of this objective guideline to fulfill the purposes of the Act also removes the federal courts, to the extent compatible with maintenance of constitutional and statutory rights, from detailed and subjective scrutiny of what is essentially a local political process. While the "fracturing" of a cohesive community may be undesirable and, under some circumstances, unlawful, we are not authorized to correct it here unless the reasonable opportunity of a minority to elect representatives of its choice is directly at stake. A similar limitation applies to our power to mandate that the size of a minority group within a particular ward never be decreased. These approaches should be followed in order to achieve the goals of the Act; broad and inflexible strictures against "fracturing" or reduction of majorities within individual wards, which have no direct electoral effect, might impose an impossible burden on the drafters of a redistricting plan in what is, in any event, a difficult task.[25]

24. Stip. 48. This failure of the 1970 census to consider the Hispanics as a discrete ethnic minority would also cast some doubt on the legitimacy of using the 1970 ward map as an indicator of the voting strength to which the Hispanic community is entitled in the 1980's. *See also supra* n. 1.

25. Of course, in this very case, where the facts make it appropriate, we are proposing a remedy

for the Hispanic plaintiffs which centers on the elimination of "fracturing." "Packing" was an important consideration in the plan modification sought in *Rybicki II,* 574 F.Supp. at 1149, 1154–58. In addition, retrogression within a voting district might well under many circumstances require a remedy. All these matters, we believe, should be viewed within the totality of the circumstances.

In summarizing the guidelines which the district court should apply in fashioning a suitable remedy, we note the following criteria. First, the retrogression in the number of wards in which blacks have a reasonable opportunity to elect a candidate of their choice should be eliminated by establishing an effective black majority in at least nineteen wards. The district court should determine, in its discretion, whether it is possible to create four wards with an effective majority of Hispanics. Second, the district court must seriously consider the factors underlying the formation and definition of an effective majority in the black and Hispanic wards. To do so, additional evidence—primarily statistical but including other types of data—may be required, which the district court must then evaluate for reliability and significance. Depending on the district court's evaluation of these data, it may decide to adopt a corrective based directly on these statistics or some other uniform corrective such as the widely accepted 65% guideline. The use of a corrective should not be rejected for reasons which fail to take account of the electoral facts and the need to provide *effective* majorities. Failure to consider these factors fully is to leave the violation of voting rights essentially unremedied. Where voting age population statistics are available and found by the district court to be reliable these may also be used in place of total population statistics.

For the foregoing reasons, the decision of the district court is affirmed in part, reversed in part, and remanded to the district court for reconsideration of the remedy in a manner consistent with this opinion. Circuit Rule 18 shall apply.