Alvin NASH, Earl Pitts, African American Voting Rights Legal Defense Fund, Inc., Charles Troupe, Theodore Hoskins, Ada Hill, Plaintiffs,

v.

Roy BLUNT, in his official capacity as Secretary of State of the State of Missouri, Defendant,

Thomas Stoff, Neil Molloy, Patrick Dougherty, Francis Brady, Henry Bufkins, Matt O'Neill, Gail Chatfield, Charles Dooley, Ron Auer, Melvin Weems, Myron Paris, John Lodwick, Jr., Jack Holland, Richard DeCoster, David Childers, Sharon Carpenter, Paula Carter, Russell Goward, Richard Dorsey, Intervenor–Defendants.

No. 91–0840–CV–W–2.

United States District Court, W.D. Missouri, W.D.

July 15, 1992.

Edward L. Pendleton, Kansas City, Mo., for plaintiffs Alvin Nash and Earl Pitts.

Elbert A. Walton, Jr., Elbert A. Walton, Jr., P.C., St. Louis, Mo., for plaintiff African American Voting Rights Legal Defense Fund, Inc.

Veronica Jongenelen, Benson & McKay, Kansas City, Mo., for intervenors Melvin Weems, Myron Paris, John Lodwick, Jr., Jack Holland, Richard J. DeCoster, David Childers, Sharon Q. Carpenter.

Patrick J. Connaghan, St. Louis, Mo., Michael D. Fitzgerald, Van Osdol, Magruder, Erickson & Redmond, P.C., James M. Smart, Jr., Crews, Smarat, Whitehead, Brownlee & Waits, Kansas City, Mo., Steven W. Garrett, Curtis, Oetting, Heinz, Garrett & Soule, P.C., Clayton, Mo., for intervenors Thomas P. Stoff, Neil Molloy, Patrick Dougherty, Francis R. Brady, Henry Bufkins, Matt O. O'Neill, Gail Chatfield, Charles Dooley and Ron Auer.

Maryella Kelly, St. Charles, Mo., for intervenor Richard P. Dorsey.

Paula J. Carter, State Representative of the 56th Legislative Dist. in the City of St. Louis, pro se.

Russell Goward, State Representative of the 60th Legislative Dist. in the City of St. Louis, pro se.

Asst. Atty. Gen. Michael L. Boicourt, Jefferson City, Mo., for defendant Roy D. Blunt, in his official capacity as Secretary of State of the State of Missouri.

Before GIBSON, Senior Circuit Judge, SACHS, Chief District Judge, and GAITAN, District Judge.

GIBSON, Senior Circuit Judge.

On September 20 and 23, 1991, lawsuits challenging the Missouri House Redistricting Commission's (hereinafter "the Commission") house redistricting plan[1] were filed in the Eastern and Western Districts of Missouri, respectively. On December 18, the two cases were consolidated before this three-judge court in the Western District of Missouri. The plaintiffs and defendants entered into a proposed settlement and asked this court to set aside the Commission's duly promulgated plan and replace it with the parties' settlement plan. At that time, we allowed certain interested parties to participate in the proceedings as intervenor-defendants. *See Nash v. Blunt,* 140 F.R.D. 400 (W.D.Mo.1992) (memorandum and order denying reconsideration of orders allowing intervention). Later, after a public hearing was held, we determined we lacked authority to displace the Commission's plan absent a finding that the Commission's plan violated the law. *Nash v. Blunt,* No. 91-0840-CV-W-2 (Jan. 24, 1992). Without going into great detail, our conclusion was based on the fact that redistricting, whether for voting units or districts set up to elect federal, state, county, or other governmental officials, is primarily a legislative function. The courts, as the third coordinating branch of government, are not the anointed body to redistrict any of the various district units for the election of state or federal officials. The redistricting process, being primarily a legislative act, is usually conducted by either elected or appointed officials acting under constitutional and statutory restraints and principles. The courts are not participants in this redistricting activity as a general rule, and only should assume jurisdiction of a redistricting procedure when (1) specifically provided by law or (2) where an adopted plan is challenged on constitutional or statutory principles and the court finds after a

---

1. The Commission's plan became effective as soon as it was adopted by the Commission in accordance with the procedures outlined in the Missouri Constitution. Mo. Const. art. III, § 2, ¶ 10.

hearing that the redistricting plan adopted is invalid because of constitutional or statutory directives or proscriptions. In some instances courts are actively engaged in adopting a redistricting plan when other governmental bodies fail to, or are unable to, do so. *See* Mo. Const. art. III, § 7, ¶ 3. The legislative process has not failed in this case, there being a duly promulgated plan. Thus, this court is not empowered to even consider or adopt any proposed redistricting plan, whether provided by litigants or designed by itself, until the current duly adopted plan has been found invalid.[2] Trial commenced on March 30, 1992 and concluded on April 2.

The plaintiffs challenge three portions of the 1991 Missouri House of Representatives redistricting plan; specifically, they challenge the plan as it applies to St. Louis City, St. Louis County,[3] and Jackson County. The plaintiffs' second amended complaint bases all legal challenges on Section 2 et seq. of the Voting Rights Act, 42 U.S.C. § 1973 et seq. (1988) (hereinafter "the Act"). For relief, the plaintiffs requested 1) a declaration that the Commission's plan violated the Act, 2) replacement of the Commission's plan with the settlement plan, and 3) imposition of preclearance requirements on the State of Missouri. For the reasons stated below, the plaintiffs' request for relief is denied.[4]

## I. BACKGROUND

Following the 1990 decennial census, the Governor of Missouri appointed an eighteen-member,[5] bipartisan commission to redraw the districts for the Missouri House of Representatives. *See* Mo. Const. art.

III, § 2, ¶ 1. Missouri law requires there be one hundred sixty-three (163) house districts, each of which must "be composed of contiguous territory as compact as may be." *Id.* ¶ 7. Additionally, the population of each district must be as near to 1/163 of the state's total population as possible. *Id.* ¶ 6. In order for a plan to constitute the valid product of the Commission, it must receive approval from 70% (or fourteen) of the Commissioners; thus, a majority of both political parties must agree to a plan before it can be filed with the Secretary of State. *Id.* ¶ 9.

The 1990 census revealed the following data about Missouri's population:

The total population of Missouri is 5,117,-073. Consequently, the ideal population for each House district is 31,393.

548,208 (or 10.7%) of Missouri's citizens are black.

The voting age population of Missouri is 3,802,247. 369,239 (or 9.7%) of the voting age population is black. 81.6% of the total black voting age population lives in either St. Louis City, St. Louis County, or Jackson County.

633,232 people live in Jackson County; 21.4% of them are black.

396,665 people live in St. Louis City; 47.5% of them are black.

993,529 people live in St. Louis County; 14.0% of them are black.

472,417 people in Jackson County are of voting age; 19.3% of them are black.

296,645 people in St. Louis City are of voting age; 42.7% of them are black.

**2.** We note that the Missouri Constitution directs the governor to appoint a new redistricting commission within sixty days of receiving notice that a reapportionment plan has been invalidated by a court of competent jurisdiction. Mo. Const. art. III, § 2, ¶ 1.

**3.** St. Louis City is separate, both geographically and politically, from St. Louis County and is "recognized both as a city and as a county...." Mo. Const. art. VI § 31.

**4.** The intervenor-defendants have filed a request for payment of legal fees and expenses. We will entertain their request; however, they are ordered to file, within fifteen days after this opinion is filed, an itemization of those expenses and fees and an explanation as to this court's legal basis for ordering payment of those costs, including reasonable attorneys' fees. The other parties shall have fifteen days after the intervenor-defendants file this material to file any responses they desire.

**5.** Each of the two major political parties nominated two candidates from each of Missouri's nine Congressional districts, and the governor then chose one of each party's nominee from every district. *See* Mo. Const. art. III, § 2, ¶ 1.

749,134 people in St. Louis County are of voting age; 12.6% of them are black.

The 1980 census showed:

The total population of Missouri was 4,916,766. Consequently, the ideal population for each House district was 30,164.

514,276 (10.5%) of Missouri's citizens were black.

The voting age population of Missouri was 3,554,203. 331,303 (9.3%) of the voting age population was black.

629,266 people lived in Jackson County; 125,780 of them were black.

452,801 people lived in St. Louis City; approximately 206,170 of them were black.

974,180 people lived in St. Louis County; approximately 109,140 of them were black.

80,735 (17.6%) of the voting age population in Jackson County was black.

134,750 (40.3%) of the voting age population in St. Louis City was black.

68,114 (9.6%) of the voting age population in St. Louis County was black.

The plan approved in 1981 following the 1980 census created:

21 districts in Jackson County. Of these, four had black populations exceeding 65% and black voting age populations greater than 60%.

15 districts in St. Louis City. Of these, seven had black populations exceeding 65% and black voting age populations greater than 60%.

32 districts in St. Louis County. Of these, none had black populations exceeding 65%, (though one had a black population of approximately 60%), and none had black voting age populations greater than 60%, (though one did have a black voting age population of 51.3%).

By 1990, population changes had significantly altered the racial makeup of only one district. District 79, located in St. Louis County, had a black voting age population of 51.3% when it was initially drawn in 1981, but the 1990 census revealed the district had a black voting age population of 68.7%.

Following the 1990 elections, there were a total of thirteen black representatives. Two came from districts with black voting age populations less than 50%—Carson Ross, from district 49,[6] and Ronnie White from district 63.

Eleven of the twelve districts with black voting age populations greater than 60% were represented by black representatives; the twelfth (district 79) was represented by a white representative.

The two parties' Commission members divided the task for drawing proposed maps differently. The Republican Commissioners relied primarily on a staff supplied by the Republican Party to provide them with maps, statistics, and proposed plans. The Democratic Commissioners divided their work by Congressional district; each Democratic Commissioner was to have primary responsibility for drawing the districts in the Congressional district he or she lived in. In order to obtain input from the public, the Commission held hearings in various locations throughout the state. Witnesses at hearings held in the St. Louis area testified it would be undesirable for districts to cross the city/county line because the needs and concerns of St. Louis County and St. Louis City were different and, at times, mutually exclusive. During the period the hearings were held, the Commission members also met amongst themselves to discuss problems and concerns. These meetings included caucuses, which were partisan meetings, and "breakout" sessions, which were bipartisan meetings between Commissioners from various regions. The Democratic caucuses were particularly important because, as the individual Commissioners discovered the need to cross into another Congressional district to "capture" or "surrender" population that would not fit into a district, they required an opportunity to discuss matters with the Commissioners from neighboring Congressional districts.

---

**6.** Carson Ross, unlike the other black representatives discussed in this opinion (and unlike most black voters in the three geographic areas under discussion) is a Republican.

Dr. Charlene Jones, the Democratic Commissioner from the First Congressional District, was the only black Commissioner. She consulted materials supplied to her from a variety of sources (including the 1991 Missouri Apportionment Commission Handbook, supplied by the Missouri Office of Administration), as well as various laws and regulations relating to voting rights. Dr. Jones interpreted these materials as indicating the Commission had a legal obligation to draw a plan that created the maximum possible number of districts with black populations greater than 65%. Dr. Jones expressed her views to other Commissioners, both informally and at Committee meetings, but none pledged to support her efforts. On August 15, 1991, Dr. Jones formally presented the Committee with a proposed plan for Jackson County, St. Louis County, and St. Louis City that she believed optimally maximized black voting strength in those areas. Dr. Jones did not work with other Committee members in drawing this partial map, even though she drew lines in the Second, Third, Fifth, Seventh, Eighth, and Ninth Congressional Districts. At the time she presented her proposal, Dr. Jones insisted that any map approved by the Committee had to include the districts she had drawn in order to satisfy the Act, and formally asked the Committee to agree to use the districts she had drawn as a starting point in all efforts to draw a map. Dr. Jones' motion died for lack of a second; thereafter, Dr. Jones did not participate in caucus or breakout meetings, leaving other Democratic Commissioners to draw the lines in the First Congressional District.[7]

Dr. Jones' plan for Jackson County had one district with a black population greater than 65% and a black voting age population greater than 60%. Additionally, four other districts had black populations of 64.2%, 63.7%, 62.6%, and 62.1%. All four of these districts had black voting age populations greater than 50%, though none exceeded 60%.

Dr. Jones' plan for St. Louis City drew 7 districts with black voting age populations greater than 60% and black populations greater than 65%. Additionally, an eighth district had a black population of 42.5%.

Dr. Jones' plan for St. Louis County drew two districts with black populations greater than 65%. A third district had a black population of 64.9% and a fourth had a black population of 64.8%. All four of these districts had black voting age populations greater than 60%.

On September 20, 1992, the Commission approved a plan by a 14–4 vote.[8] Dr. Jones cast one of the dissenting votes.

In Jackson County, the Commission created 20 districts. Four of them had black populations greater than 65% and black voting age populations greater than 60%.

In St. Louis City, the Commission created 13 districts, five of which had black populations over 65% and black voting age populations greater than 60%. Additionally, a sixth district had a black population of 59.1% and a black voting age population of 51.2%.[9]

In St. Louis County, the Commission created 32 districts. One had a black population greater than 65%, one had a black population of 64.7%, one had a black population of 61%, and one had a black population of 58.5%. Two of them had black voting age populations greater than 60%, one had a black voting age population of 56.1%, and one had a black voting age population of 54.3%.

The Commission's plan contained eight districts in which a white incumbent legislator was paired against another white incumbent.[10] It also contained one district

---

**7.** Dr. Jones' partial map was incorporated, with very little deviation, into the settlement map.

**8.** The Republican Commissioners approved the plan 9–0. The Democratic Commissioners approved the plan 5–4.

**9.** In both the Commission's and Dr. Jones' plans, the percentages were actually much high-

er. This was unavoidable, given the configuration and demographics of the city.

**10.** We discount a ninth pairing from the 70th district, matching Francis Brady and Robert Quinn (both white incumbents) because Quinn had already announced he would not seek re-

(district 61) in which a black incumbent legislator was paired against another black incumbent.[11]

## II. DISCUSSION

### A. Elements of a Section Two Claim

Section 2 of the Act provides as follows: No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, ....

42 U.S.C. § 1973(a) (1988). In determining whether a voting standard, practice, or procedure violates this prohibition, Congress instructed the courts to examine "the totality of the circumstances" to ascertain whether "the political processes leading to nomination or election" are equally open to citizens of all races. *Id.* § 1973(b). Courts may also consider "[t]he extent to which members of a protected class have been elected to office," but the Act expressly states it does not establish "a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

In *Thornburg v. Gingles*, the Supreme Court examined, for the first time, the 1982 amendments to the Act. 478 U.S. 30, 34, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986). The Court recognized that the 1982 amendments made clear that intentional discrimination was no longer required in order to prove a violation of the Act. *Id.* at 35, 106 S.Ct. at 2758. The Court, in considering a challenge to a series of multimember districts,[12] identified the following "necessary preconditions" to a § 2 claim:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67 (footnotes and internal citations omitted). Once these preconditions are met, a court must consider the factors identified in the Senate Report accompanying the 1982 amendments. *Id.* at 48, 106 S.Ct. at 2765; *see also Jeffers v. Clinton,* 730 F.Supp. 196, 209 (E.D.Ark.1989) (three-judge court), *aff'd,* —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991). Those factors are:

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

---

election and would instead run for Secretary of State.

**11.** The plaintiffs contend two other districts contained pairings involving black incumbents: district 64, matching William Clay (black incumbent) against Tom Stoff (white incumbent), and district 57, matching O.L. Shelton against Frank Williamson (both black incumbents). However, we do not consider these true matchings. William Clay was the representative from district 64 until September 3, 1991, at which time he won a special election to the Missouri Senate. The Commission's plan was filed on September 20; thus, at the time the plan was filed, there actually was no incumbent from Clay's district.

In October, Williamson filed for the special election to fill Clay's vacancy, and he won the election in November. This, obviously, was after the Commission filed its plan, and there is no evidence in the record to suggest the Commission knew Williamson would run for, much less win, Clay's seat.

**12.** Although *Gingles* involved a challenge to the use of multi-member districts and expressly did not address the appropriate analysis for challenges to single-member districts, *see Gingles,* 478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12, its analytical framework has been applied to cases in which single-member districts are challenged. *E.g., Illinois Legislative Redistricting Comm'n v. LaPaille,* 786 F.Supp. 704, 711 (N.D.Ill.1992) (three-judge court); *Jeffers v. Clinton,* 730 F.Supp. 196, 205 (E.D.Ark.1989) (three judge court), *aff'd,* —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991); *Neal v. Coleburn,* 689 F.Supp. 1426, 1435 (E.D.Va.1988).

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Sen.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07. This list of factors, however, "is neither comprehensive nor exclusive;" individual may "be pertinent to certain types of § 2 violations, [and] other factors may also be relevant and may be considered." *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763.

### B. Maximization

 The plaintiffs assert the Act requires that the body charged with drawing the new districts must draw as many districts containing 65% or more black residents as is mathematically and legally possible. We reject this argument for a variety of reasons, foremost of which is the lack of any language in the Act to support this position. The only language contained in the Act that discusses the degree of representation that should be required is in 42 U.S.C. § 1973(b), where it states "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the

population." As the Senate Report accompanying the 1982 amendments to the Act (which added this quoted language) states, this provision is intended to "put[ ] to rest any concerns that have been voiced about racial quotas." Sen.Rep. No. 417, 97th Cong., 2d Sess. 31 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 208. Given Congress' express statement that the Act does not require proportional representation, we do not believe Congress intended the Act to require maximum representation. The converse of such a requirement would be a continuing duty to minimize representation by majority groups—a concept probably more controversial than proportional representation, which, as noted above, was specifically rejected by Congress.

The plaintiffs contend *Jeffers* interpreted the Act as requiring maximum representation; however, our review of *Jeffers* has uncovered no part of the court's opinion in which the majority concluded the Act required the drawing of the maximum possible number of minority-controlled districts. Though the *Jeffers* court did consider the number of black-majority districts that could have been drawn, it did so only to ascertain whether the minority population was "sufficiently large and geographically compact to constitute a majority in single-member districts" as required by the first of the essential factors identified in *Gingles*. *Jeffers*, 730 F.Supp. at 205. The *Jeffers* court went on to examine the remaining two essential factors, *id.* at 208–09, as well as the additional factors identified in the Senate Report. *Id.* at 209–17. Though the *Jeffers* court ultimately determined the Act had been violated, it did not base its legal conclusion solely upon the fact that more minority-controlled districts could have been drawn. In fact, in ordering state officials to create a new plan, the court was careful to state that it was "not holding that the law requires the creation of any particular number of majority-black districts." *Id.* at 217. The court also sustained the redistricting plan with respect to Pulaski County, which was designed to create three majority-black districts, even

though four such single member districts were possible. *Id.* at 216–18.

We also believe the plaintiffs' argument is defeated by the very existence of the Supreme Court's holding in *Gingles.* As discussed in Part II.A., *supra,* the *Gingles* Court identified the appropriate analytical framework for a § 2 claim. That analysis does not suggest the Act requires maximum possible minority representation, nor does it suggest that proving more minority-dominated districts could have been drawn will substitute for the *Gingles* analysis. Thus, though the plaintiffs have proven more districts could be drawn by sacrificing a certain degree of compactness, this fact does not prove the Commission's plan violates the Act.[13]

## C. Retrogression

The plaintiffs also contend they can prove a § 2 violation simply by proving the existence of retrogression. Retrogression can occur through redistricting or the imposition of vote diluting devices. The plaintiffs contend the new plan is retrogressive because it creates less minority controlled districts in St. Louis City (five) than there were in 1990 (seven).[14] The plaintiffs also contend an abnormally high percentage of black legislators are paired together in the Commission's plan, which is another indicator that retrogression may have occurred.[15] However, retrogression is not determina-

tive of a § 2 claim, but rather is determinative of a § 5 claim.

Section 5 of the Act requires certain states and localities to preclear any changes in their voting procedures (including reapportionment) with the Attorney General before those changes may be utilized in an election. 42 U.S.C. § 1973c (1988).[16] The purpose of these provisions has been identified by the Supreme Court thusly:

"Section 5 was a response to a common practice in some jurisdictions of staying one step ahead of the federal courts by passing new discriminatory voting laws as soon as the old ones had been struck down. That practice had been possible because each new law remained in effect until the Justice Department or private plaintiffs were able to sustain the burden of proving that the new law, too, was discriminatory.... Congress therefore decided, as the Supreme Court held it could, to shift the advantage of time and inertia from the perpetrators of the evil to its victim, by freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory."

*Beer v. United States,* 425 U.S. 130, 140, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976) (quoting H.R.Rep. No. 94–196, 94th Cong., 1st Sess. 57–58 (1975) (internal quotations

---

**13.** There has been much discussion of the relative compactness of Dr. Jones' plan and the Commission's plan. A visual inspection of the two plans demonstrates Dr. Jones' plan is less compact than the Commission's plan; however, we are not passing on the issue of whether Dr. Jones' plan is so lacking in compactness that it could not pass Constitutional muster.

The defendants have also attacked Dr. Jones' plan on two other fronts. First, they contend that despite the percentages of blacks in her supposed minority controlled districts, black voters will not really control the elections. Second, they contend her plan is undesirable in that it divides communities in a series of unpopular and absurd manners. Given the nature of our decision today, we do not make any findings about the truth or legal effect of these claims.

**14.** The defendants argue the loss of districts was due to the loss of population in St. Louis City,

and that some of the districts that had black majorities in 1990 were significantly underpopulated because of that loss in population. The plaintiffs counter by arguing the percentage of blacks overall increased. Because of the nature of our decision regarding retrogression, we will not resolve this factual dispute.

**15.** As noted earlier, we do not agree with the plaintiffs' calculation regarding the number of paired incumbents. Nonetheless, our holding on this issue obviates the need to discuss the effect of the paired incumbents in greater detail; however, the number of paired black incumbents could be due to the resultant underpopulation in the black districts over the past ten-year period.

**16.** Neither Missouri, nor any of the locales at issue in this suit, are required to obtain preclearance prior to enacting changes in voting procedures.

omitted)).[17] "In other words the purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Id.* at 141, 96 S.Ct. at 1364; *see also Lockhart v. United States*, 460 U.S. 125, 134 n. 10, 103 S.Ct. 998, 1004 n. 10, 74 L.Ed.2d 863 (1983). Though retrogression appears to be a primary issue in § 5 cases, we have found no cases in which retrogression, without more, served to satisfy all of the plaintiff's burden in a § 2 case. *Cf. Davis v. Bandemer*, 478 U.S. 109, 133, 106 S.Ct. 2797, 2810, 92 L.Ed.2d 85 (1986) (plurality opinion) (dicta) (indicating the no-retrogression rule is required by § 5 of the Act). We once again rely on the Supreme Court's discussion in *Gingles* to reject the plaintiffs' claim that they can carry their burden on § 2 merely by proving retrogression; if retrogression were all that need be proved to demonstrate a § 2 violation, we suspect the *Gingles* Court would have so indicated.

■ This is not to say proof of retrogression is wholly unimportant in a § 2 case; we simply hold that such proof, alone, will not prove the existence of a § 2 violation. Given that the list of factors contained in the Senate Report is not exhaustive, we believe evidence of retrogression (along with any explanations) may appropriately be considered along with the other factors identified by the Senate Report. Of course, as explained in Part II.A. *supra*, the Senate Report's factors are considered only after the plaintiff has proven the three necessary preconditions enunciated in *Gingles*.

### D. The Defense of Proportional Representation

■ The defendants contend the Commission's plan allows for proportional representation, and this fact serves as a defense to the plaintiffs' suit. The defendants are partially correct. *Gingles* held that "proof that some minority candidates have been elected does not foreclose a § 2 claim." 478 U.S. at 75, 106 S.Ct. at 2779. However, "persistent proportional representation is inconsistent with [the] allegation that the ability of black voters ... to elect representatives of their choice is not equal to that enjoyed by the white majority." *Id.* at 77, 106 S.Ct. at 2780.[18] This statement of law is hardly surprising. *Gingles* requires a successful § 2 plaintiff prove that white voters usually vote together as a block to defeat the minority-preferred candidate. If defendants can prove prior persistent proportional representation, it would be virtually impossible for the plaintiffs to prove white voters usually vote together to defeat minority-preferred candidates.

■ In what we believe to be in the interest of clarity, we will address the merits of the affirmative defense before addressing the merits of the plaintiffs' case. In assessing whether there has been persistent proportional representation, we believe two elements must be discussed: we must first examine the history of minority representation in the challenged geographical areas, and then we must determine whether the Commission plan is likely to continue the past trend of proportional representation.

Assessing the history of minority representation presents a problem. Inasmuch as the Act protects voters (as opposed to candidates), the appropriate inquiry would seem to be an analysis of the success of minority preferred candidates. However, in discussing this defense, the *Gingles* Court concentrated on the success of minority candidates, and did not discuss the success of minority preferred candidates.

---

**17.** We note that the plaintiffs have drawn primary support for their retrogression claim from *Beer*, and have not cited any case that found a § 2 violation based solely on retrogression.

**18.** Only Justice White joined Justice Brennan in this portion of the Court's opinion. *Gingles*, 478 U.S. at 34, 106 S.Ct. at 2758. However, Justice O'Connor, joined by Chief Justice Burger, Justice Powell, and Justice Rehnquist, expressed support for this position. *Id.* at 102, 106 S.Ct. at 2793 (O'Connor, J., concurring).

478 U.S. at 77, 106 S.Ct. at 2780.[19] Therefore, we will consider the success of prior black candidates without regard to whether they were elected from predominately black districts.

■ There is also a dispute regarding how to measure whether black voters have a fair opportunity to elect the candidate of their choice. The plaintiffs insist the analysis must begin by assuming 65% of the district's total population must be black. The defendants agree this is valid, but contend a superior starting assumption is that 60% of the voting age population must be black. In *Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985), the court commented that the usual practice was to "augment[ ] a simple majority with an additional 5% for young population, 5% for low voter registration and 5% for low voter turn-out, for a total increment of 15% of total population." *Id.* at 1415. These corrective estimates are to be used when the actual data is unavailable, *id.* at 1416, but if, for instance, "voting age population statistics are used, 5% would drop out of the formula, leaving something in the vicinity of 60% of voting age population as the target percentage." *Id.* at 1415. Until as recently as 1980, reliable census data relating to voting age populations was not recorded, hence there was a need to rely on some estimate to equalize that factor. However, in 1990, the census data contained statistics regarding voting age populations. Following *Ketchum,* the superior analysis would consider 60% of the voting age population instead of relying on the additional 5% historically needed to equalize the age factor. *See id.* at 1413. Therefore, in determining whether black voters are likely to have an opportunity to select the candidate of their choice, we will begin our analysis by assuming 60% of the voting age population is the appropriate target percentage.

■ Finally, the plaintiffs contend proportional representation is meaningless unless the percentage of black representatives approximates the percentage of blacks living in the state. We disagree. Approximately 85,200 (or 15.5%) of Missouri's black residents live outside the three areas at issue in this case. It is undisputed that this portion of Missouri's black population is too small and geographically disbursed to constitute a majority in a district,[20] and there is no authority to suggest that these citizens' inability to be included together in one or more districts should be "made up" by increasing the number of minority controlled districts in those areas of the state where black citizens are most concentrated. Because the starting point of a § 2 claim requires that the minority population be sufficiently numerous and compact to constitute a majority in a district, we think it appropriate to focus our attention and analysis on those portions of the state where this condition exists. Consequently, we will endeavor to ascertain whether there has been proportional representation in Jackson County, St. Louis City, and St. Louis County.

### 1. *Jackson County*

■ Throughout the 1980s, the percentage of blacks living in Jackson County was approximately 20%. Until the districts were redrawn in 1991, Jackson County had twenty-one districts.[21] In 1982, which was the first election after the 1981 districts went into effect, 4 black representatives were elected. Four black representatives were elected in 1984 and 1986 as well. In

**19.** The two categories often, but not always, describe the same thing. In this case, for instance, we would include Carson Ross, a black representative who was elected from a predominately white district (district 49), but would not include Francis Brady, a white representative who was elected from a predominately black district (district 79).

**20.** Dr. Jones testified she attempted to form a minority-controlled district in Springfield, but could not do so because there were not enough black residents to form a majority, much less a supermajority.

**21.** This roughly corresponds to the number of districts Jackson County was entitled to, which is calculated by dividing the population of Jackson County by the ideal district size. This calculation indicates Jackson County was entitled to 20.86 districts.

1988 and 1990, five black representatives were elected. Thus, during the past decade, the proportion of black legislators from Jackson County has been almost exactly equal to the proportion of black citizens living in Jackson County.

The 1991 plan created 20 districts in Jackson County. The loss of one district was attributed to the fact Jackson County lost population while other portions of the state gained population. In fact, if the population of Jackson County is divided by the ideal district size, one would discover that Jackson County was entitled to approximately 20.17 districts. Four of the twenty districts had black voting age populations greater than 60%. These districts fit well within the permissible range suggested by *Ketchum*, and we believe these districts are effective minority districts; that is, minority voters will have a fair opportunity to elect the representatives of their choice. Our holding is bolstered not only by the defendants' experts, but also by the plaintiffs' expert, who testified that the unusually strong political organization of black voters in Jackson County would probably allow creation of effective minority districts with percentages less than those suggested in *Ketchum*. Finally, we note the percentage of effective minority districts (20%) is nearly the same as the percentage of black residents in Jackson County (21.4%). Thus, we conclude that there has been at least a ten-year history of proportional representation,[22] as well as a near certain likelihood that there will be proportional representation for the next decade. Therefore, we find the defendants have successfully proved the elements of this affirmative defense.

### 2. *St. Louis City*

▪ Throughout the 1980s, black citizens constituted approximately 47% of St. Louis City's population. During the last decade, there were 15 districts in St. Louis City.[23] In the first election following the·

1981 reapportionment, seven black representatives were elected. Seven black representatives were also elected in 1984 and 1986. In 1988 and 1990, eight black legislators were elected. Thus, throughout the 1980s, the proportion of black legislators from St. Louis City has nearly approximated the proportion of black citizens living in St. Louis City.

The 1991 Commission plan contains 13 districts in St. Louis City; as was the case in Jackson County, the decrease in districts was due to a substantial loss of population. Based on the ideal district size and the city's population, there should be approximately 12.63 districts in St. Louis City. Of the 13 districts, five have black voting age population greater than 60%. A sixth district has a black voting age population of 51.2%. Though this latter district is significantly below the 60% benchmark suggested by *Ketchum*, we believe it to be an effective minority district. First, this district will have a black incumbent—Representative Ronnie White—who was previously elected from a district with a black voting age population of 36.1%. If it is true, as the plaintiffs contend, that White was and is the minority preferred candidate, his prospects for reelection have only been enhanced by increasing the percentage of minorities in his district from 36% to 51%. In fact, it is our understanding that White (presumably a practical politician) is satisfied with his new district. Secondly, the parties concede the key to winning elections in St. Louis City lies in winning the democratic primary. The primary can be won by a plurality of the vote, which effectively lowers the percentage of votes needed to win. Nearly 90% of all black voters are democratic, thus giving the black voters greater political weight than if there were a majority vote requirement. Furthermore, St. Louis City as a whole is predominately democratic, so the winner of

---

**22.** The plaintiffs have provided the history of blacks in political office in Missouri in ten year increments from 1900 to the present. However, in discussing this factor, *Gingles* did not go nearly so far. *Gingles*, 478 U.S. at 77, 106 S.Ct. at 2780. We therefore do not believe it neces-

sary to analyze the proportion of representation any earlier than 1982.

**23.** The calculation described in note 21 *supra* indicates St. Louis City was entitled to 15.01 districts in the 1981 reapportionment plan.

the democratic primary stands an excellent chance of winning the general election. These two factors convince us that all six of these districts, or 46% of the total districts, will allow minority voters an opportunity to fairly participate in the political process, which is very near the percentage of black residents in St. Louis City. Given the past history of, and future prospects for, proportional representation in St. Louis City, we find the defendants have met their burden with regard to this defense insofar as St. Louis City is concerned.

### 3. St. Louis County

The 1981 redistricting plan drew thirty-one districts in St. Louis County.[24] Throughout the decade, the percentage of blacks living in St. Louis County rose from approximately 11% to approximately 14%. However, only one black legislator was elected from St. Louis County during the 1980s, and he was defeated in 1990.

The 1991 plan creates thirty-two districts in St. Louis County. The increase in districts can be attributed to an increase in population in the county. Based on the population, one would expect St. Louis County to have approximately 31.65 districts. Of these districts, two have black voting age populations greater than 60%; two other districts have black voting age populations of 56.1% and 54.3%, respectively. The plaintiffs contend this will not assure proportional representation in the future because two of the districts fall below the 60% mark, and that 60% is inadequate in any event because it does not take into account such factors as incumbency

and campaign financing. The plaintiffs also contend it has been judicially established that a black population of 66% is necessary in St. Louis County in order to insure minorities a fair opportunity to participate in the electoral process. We reject each of these arguments.

■■■ As *Ketchum* makes abundantly clear, the 60% and 65% figures are only guidelines as to what constitute effective minority districts. The precise number is a question of fact that may differ depending upon the circumstances. *Fletcher v. Golder*, 959 F.2d 106, 110 (8th Cir.1992). Using both homogeneous precinct analysis[25] and bivariate ecological regression,[26] the defendants' experts calculated the percentage of black and white voters who actually cast votes in the last three elections. This was done by applying the above-described statistical techniques to the number of votes cast for the highest office in the election and the results of local elections. This would equalize for all three factors for which *Ketchum* suggests a 5% enhancement; the experts' analysis, by calculating the percentages of whites and non-whites actually casting votes, takes into account age, registration, and turn-out rate. This enabled the experts to calculate the true equalizing percentage, obviating the need to rely on the estimates from *Ketchum*.

■■■ The results of this analysis suggests the true equalizing percentage in St. Louis is somewhere around 55%. Though we have some doubts about the accuracy of this percentage,[27] we think the testimony is

---

24. According to the calculation described in note 21 *supra*, St. Louis County was entitled to 32.29 districts.

25. Homogeneous precinct analysis compares the voting patterns in voting districts that are at least 90% white with the patterns in voting districts that are at least 90% black. This allows one to approximate the preferences of the black and white voters.

26. Bivariate ecological regression considers the voting in all voting districts by plotting the results on a graph. The X axis represents the black voting age populations, by percentage, of each voting district. The Y axis represents the number of votes received by a particular candidate in each voting district. A line is then

drawn that minimizes the distance between each of the points on the graph and the line; this line represents the relationship between race and the votes received by the candidate.

27. We have two primary concerns. First, the data starts by using the votes cast for the highest office on the ballot, as opposed to the votes cast for the particular race being studied. This discrepancy is necessitated by the fact that Missouri does not tabulate the votes cast for each office; it tabulates only the votes cast for the highest office. Thus, there is no way to measure the "drop off;" that is, the number of people who vote only for the highest office on the ballot and eschew the opportunity to vote for the others. There is also no indication how

useful for suggesting the equalizing percentage is less than 60% of the voting age population. Therefore, we conclude it is not fatal that the black voting age population in all four minority controlled districts is less than 60% when two of the districts are over 60% and the other two are 56.1% and 54.3%, respectively.

■ The plaintiffs' claims that we must adjust the percentage upward to take into account the incumbency reelection factor and campaign financing disparity are not supported in the law. The Act does not impose this requirement, and we do not believe it wise to try to estimate the percentage of black voters necessary to "make up" for these obstacles. We accept as true that incumbents are frequently returned to office, that incumbents tend to receive more campaign contributions than challengers, and that black candidates receive less campaign contributions than white candidates. Nonetheless, we do not think the Act was designed to equalize all political disparities by further increasing the percentage of minorities in voting districts.

Even if these factors should somehow be equalized, and even if we knew how to do so, we are not sure they should be equalized in all four districts. For instance, one of the districts (district 69) will have a black voting age population of 56.1% and no incumbent representative; it seems inappropriate to take incumbency and financing into account when there is no incumbent. Furthermore, in district 79, the incumbent representative had been elected in a district that had a black voting age population of 68.7%. Though the plaintiffs suggest this representative is not the minority preferred candidate because he is white, the plaintiffs offer no probative evidence to support this claim. We will not attempt to determine whether he is or is not; we merely mention this situation to demonstrate the difficulty we would have trying

to compensate for the additional factors suggested by the plaintiffs.

■ Finally, the plaintiffs contend that a federal court has already ruled a district in St. Louis County must have a black population of at least 66% in order to be an effective minority district. *See Fletcher v. Golder*, No. 91–2314C(7), slip op. at 15–17, 1992 WL 105910 (E.D.Mo.), *aff'd*, 959 F.2d 106 (8th Cir.1992). We believe the circumstances in *Fletcher* differ from the circumstances in this case. In *Fletcher*, the court was called on to draw the districts for the St. Louis County Council because the legislative process designed to redraw the district lines had failed to do so. Generally, when a federal court is called on to draw district lines, it is required to follow stricter standards than the legislative body charged with the initial responsibility of redrawing districts. *See, e.g., Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978) (plurality opinion). In other words, the *Fletcher* court was seeking to create ideal districts; we are concerned only with legal permissibility. We also note the evidence presented in *Fletcher* was different: there, a witness testified that 66% of the population in the district had to be black in order for the minorities to have a fair opportunity; nobody in this case testified that such a percentage was necessary. In this case, we heard expert testimony indicating that these four districts in St. Louis County would be effective minority districts; in *Fletcher*, the court heard expert evidence indicating that certain districts (which were part of a plan ultimately rejected by the court) would not provide minorities with fair opportunities. *Fletcher*, slip op. at 17. Finally, the *Fletcher* court ultimately approved a district with a black population of 65.1%. This figure is less than one of the districts in this case and almost the same as a second. Though this figure is slightly more than the remaining two districts in

---

much, or in what direction, this discrepancy may skew the results.

We are also concerned that many of the races studied were in 1988, which was a year with a presidential election. It is uniformly recognized that voter turn-out, particularly among

black voters, is much higher when a presidential election is on the ballot. However, the few elections examined by the experts that took place in 1986 and 1990 produced (with only one exception) similar results.

this case, we have no idea how the districts compare in terms of black voting age population, which we have already indicated is the superior basis for comparison. In short, the differences in evidence and in our judicial roles indicates we are not bound by *Fletcher*, and even if we were, we are not convinced that we have approved anything that is truly a radical departure from *Fletcher*.

Logically, our finding that there is likely to be proportional representation during the next decade should save the St. Louis County districts from an attack under the Act. However, under the current status of the law as contained in *Gingles*, the defendants may be obligated to prove prior proportional representation, which they have not done with respect to St. Louis County. Therefore, we hold the defendants have failed to prove their affirmative defense with respect to St. Louis County because there has not been a history of persistent proportional representation.

### E. Application of the *Gingles* Preconditions to the Present Case

There is little disagreement among the parties that the black population is sufficiently large and geographically compact to constitute majorities in single-member districts in the geographic areas at issue in this case. Similarly, we find that black voters in these areas are politically cohesive.[28] The parties have focused on the third element: whether the white voters have voted together as a block in sufficient numbers to usually defeat the minority pre-

ferred candidate.[29] We will examine this issue in each of the three locales at issue, even though the defendants have proven their affirmative defense with respect to two of them.

### 1. *Jackson County*

■ The key battleground in Jackson County elections (as is the case in St. Louis City elections) is the Democratic Primary. Jackson County, particularly those portions within the Kansas City city limits, consists primarily of democrats; whichever candidate survives the primary, regardless of race, is likely to win the general election. These primaries, like those in St. Louis City, can be won by a plurality of the vote. In contrast, municipal elections in Kansas City[30] are non partisan and must be won by a majority of the vote.

With regard to specific elections in Jackson County, the plaintiffs' expert did not conduct a statistical analysis of the voting patterns in Jackson County, but she did discuss the results of another study involving three Jackson County-area political races: the 1979 and 1991 mayoral races in Kansas City and the 1982 Congressional race for the Fifth District.[31] In 1979, Bruce Watkins received 80% of the black vote in the mayoral primary, and finished first overall. However, in the general election, Watkins lost decisively (58.1% to 41.9%), despite garnering 90% of the black vote and 20% of the white vote. In the 1982 Democratic Primary for Congressman, Alan Wheat received 95% of the black vote, and 31.4% of the overall vote, and

---

**28.** Though it is true there have been some instances in which the black vote has split among two or more candidates, in the vast majority of elections black voters were solidly behind a single candidate.

**29.** We have, for purposes of this opinion, arbitrarily deemed any candidate receiving more than 65% of the black vote "minority preferred." There was some testimony to the effect that black voters, given a choice, would vote only for black candidates, and that a white candidate receiving a majority of the black vote was probably not a "true" preference. There was also testimony indicating that if a white person received a majority of the black vote, any black candidates probably were not viable candidates. We refuse to impart these individual witnesses'

views to black citizens as a whole. Absent some indication that a particular white candidate was truly not preferred despite receiving over 65% of the black vote, or that a particular black candidate was not viable, we will not assume that the voters in a particular political contest would have voted for someone other than the person they voted for, nor will we assume that a white candidate receiving over 65% of the black vote was not preferred by the minority voters.

**30.** Most, but not all, of Kansas City is located in Jackson County, and most (but not all) of Jackson County is located in Kansas City.

**31.** The Fifth Congressional District encompasses most, but not all, of Jackson County.

won the Democratic Primary over seven other candidates. Wheat went on to win decisively (57.9% to 40.2%) in the general election.[32] In 1991, Emanuel Cleaver obtained 36.7% of the vote—over twice that of his nearest competitor—in the mayoral primary, and went on to win the general election in spite of the presence of a traditional vote-diluting mechanism, the majority vote requirement. Cleaver received 78% of the black vote in the primary and 90% in the general election.

The defendants' experts analyzed a variety of county elections, as well as some elections from Kansas City. The county races analyzed included[33] the 1986 and 1990 democratic primary for county executive, the 1986 democratic primary for county council (district two), the 1988 democratic primary for prosecuting attorney, and the 1986 general election for county council (district 2). In two of these races, the minority preferred candidate lost. In two of them, the minority preferred candidate won; one with support of over 50% of the white voters, and the other with support of over 45% of the white voters. In the fifth race, the black vote was split almost evenly for two candidates, thus there was no minority preferred candidate.[34]

The city races analyzed included the races for city council in districts 3, 5, and 6.[35] The minority preferred candidate in district 3 lost. The minority preferred candidates in district 5 and 6 both won their respective run-offs; one had approximately 35% of the white vote and the other had over 60% of the white vote.

The plaintiffs discount these apparent successes, claiming these victories would not have occurred had there not been enough white candidates in the democratic primary to split the white vote, thereby allowing black candidates to escape the primaries with pluralities. The plaintiffs further contend that unless the minority preferred candidate receives a majority of the overall vote, the plaintiffs have satisfied their burden. We disagree. The purpose of our inquiry is to determine whether the minority's "submergence in a white ... district impedes its ability to elect its chosen representative," *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2767. Thus, our inquiry is not whether the whites are *capable* of voting as a block to defeat the minority preferred candidate—it is whether they *have done so*. The act does not impose a minimum standard or degree of support white voters must offer to the minority preferred candidate. In fact, the Supreme Court expressly recognized that the degree of polarization necessary to establish a § 2 violation may vary from locale to locale depending upon a variety of factors, including the presence of vote diluting factors. *Id.* at 56, 106 S.Ct. at 2769. In Jackson County elections, the following pattern has emerged: black candidates have been able to win the democratic primary with a plurality of the vote, and then win the general election against the republican candidate. Inasmuch as Missouri has decided to avoid the vote diluting effects of majority vote requirements in county and state elections, it would be inappropriate for us to analyze elections as if the vote diluting mechanism (and associated effect) were present. We cannot conclude the white voters usually vote as a block to defeat the minority preferred candidate, and the plaintiffs have failed to prove this necessary precondition with respect to Jackson County.

### 2. *St. Louis City*

Unlike municipal political contests in Kansas City, elections for offices in St.

---

**32.** Congressman Wheat has been reelected three times, but neither the plaintiffs' expert nor her source material discussed the dynamics of these later elections.

**33.** Two other races were analyzed, but the experts were unable to derive any data regarding the pattern of black voting in those races.

**34.** This is referring to the 1988 primary for prosecuting attorney. We point out that even if the black voters had combined their support for one of the candidates, thereby creating a single, clear minority preferred candidate, that candidate would still have lost the primary by a sizeable margin.

**35.** The defendants' experts also analyzed Cleaver's victory in 1991, and found results very similar to those already discussed.

Louis City are partisan. However, as in Jackson County, races in St. Louis City are usually won or lost in the democratic primary; in the last two decades, no citywide office has been held by a Republican. There is no majority-vote requirement in the primaries.

The plaintiffs' expert used what she described as a homogenous analysis to analyze thirteen city-wide Democratic primaries and one state Senate primary that took place in St. Louis City between 1980 and 1988. She also analyzed five city-wide Democratic primaries that took place between 1989 and 1991, using both the homogenous method and some form of regression analysis.[36] Our review of her calculations convinces us that of those nineteen races, whites voted as a block to deny victory to the minority-preferred candidate no more than seven times. In three races, the white vote was sufficiently split to allow the minority preferred candidate to win a plurality of the vote and to advance to the general election. In four races, sufficient numbers of whites supported the minority-preferred candidate to allow that candidate to win a majority of the vote. In four races, black voters were not sufficiently unified to allow us to determine who the minority preferred candidate was. Finally, in one race, the winning candidate had the support of 70% of the whites and 70% of the blacks, thereby making this candidate the candidate of choice of both races.

The defendants' expert discussed the results of a study she had conducted for purposes unrelated to this trial. This study analyzed the results of certain city-wide elections occurring between 1982 and 1989. The expert also discussed her analysis of several elections that occurred after her study, and testified that though there were some instances when white voters voted together as a block to defeat the minority preferred candidate, this did not

usually occur. She also testified that, on several occasions, the minority preferred candidate was white, and that on several occasions white candidates had received the support of influential black politicians, even when black candidates where running in the democratic primary.

The evidence proves that voting in St. Louis City is polarized along racial lines. However, the evidence falls far short of proving that the polarization is so severe that white voters usually vote together as a block to defeat the minority preferred candidate. Black candidates have been successful in city-wide elections; more importantly, minority preferred candidates (regardless of race) have been elected to public office. We therefore find the plaintiffs have failed to satisfy the preconditions for a § 2 claim in St. Louis City.

### 3. St. Louis County

The plaintiffs offered no statistical analyses of elections in St. Louis County. We are therefore at a loss to explain how we can conclude that white voters usually vote together as a block to defeat minority preferred candidates. We earlier noted that St. Louis County had, by the end of the 1980s, one district with a black voting age population of 68.7%, and that this district was represented by a white person. The plaintiffs have not proved this representative was not the minority preferred candidate, nor have they proved whites voted together as a block to elect him instead of a minority preferred candidate.

The only evidence in the record relating to St. Louis County's racial voting patterns was supplied by the defendants. This evidence generally suggested that white voters did not vote together to defeat minority preferred candidates. However, only one of these elections was a democratic primary; this caveat is significant because most black voters are democratic, and will vote for the democratic candidate in the general election, regardless of that candi-

36. The defendants contend the plaintiffs' expert's data and conclusions are unreliable because the expert did not use proper techniques and calculations. Without detailing the contrasting methods, we agree that the plaintiffs' expert did not utilize the methods approved by the Supreme Court in *Gingles,* and given the nature of her methods, her numerical conclusions are probably slightly inaccurate. Nonetheless, though her numbers may be slightly inaccurate, we believe they accurately portray the voters' behavior in these elections.

date's race. Nonetheless, in light of the plaintiffs' failure to present any evidence to carry their burden, we cannot conclude that white voters usually block the election of minority preferred candidates in St. Louis County.

## III. CONCLUSION

Both Jackson County and St. Louis City have a ten-year history of proportional representation in the Missouri House of Representatives, and the Commission's plan is likely to continue this trend for the next ten years. These findings constitute a legal defense to the plaintiffs' § 2 claim.

Elections in Jackson County, St. Louis City, and St. Louis County are all marked by racially polarized voting, and the black populations in those areas are sufficiently numerous and compact to allow for majorities in single member districts. However, the evidence presented at trial did not prove that racial block voting was so significant that whites usually voted as a block to prevent the election of minority preferred candidates. In fact, the opposite appears to be true: minority preferred candidates are frequently elected to office. This is due to fact that most elected officials are democrats, most minority preferred candidates are democrats, and the democratic primaries can be won with a plurality of a vote; therefore, the degree of white-block voting necessary to cause the usual defeat of the minority preferred candidates is higher than the degree of racial polarization present in Jackson County, St. Louis City, and St. Louis County.[37] Consequently,[38] the plaintiffs have failed to prove the necessary preconditions to a § 2 claim, and their requests for relief must be DENIED.

SACHS, Chief Judge, concurring.

This opinion records my general agreement with Judge Gibson's opinion and with the result. There are certain aspects of this litigation that in my judgment deserve further individual comment, because of their significance in this and other cases.

1. It seems worth stating my agreement with Judge Eisele that the Voting Rights Act is not "affirmative action" legislation in the sense that there is a constant legal duty imposed on those responsible for redistricting to devise plans that maximize minority group voting power. *Turner v. State of Arkansas*, 784 F.Supp. 553, 572–7 (E.D.Ark.1991) (three judge court). Such a misunderstanding of the law, widespread as it may be, seems to have caused the filing of these cases, or at least the one in Kansas City, and probably led Dr. Jones to an uncompromising and ineffective role on the Redistricting Commission. While redistricters must devise plans that are fair and equitable to racial groups in the voting population, within the discretion generally granted to such bodies, the overall objective, as I see it, is to be ultimately "race neutral." *See* commentary of James P. Turner in *Controversies in Minority Voting*, Grofman and Davidson, ed. (1992), p. 299.

2. While proportional representation is not mandated, I believe it is a useful test, and, properly understood, may sometimes be dispositive in rejecting a claim of violation of the Act. In the present case, the Kansas City plaintiffs asked us in their pleadings to concentrate attention on eight specified districts in Kansas City. Four of those districts are now, and will almost

---

**37.** We once again emphasize the uniqueness of the political landscape we have just reviewed in that there is no majority vote requirement in Missouri's primary elections, the winner of the democratic primary will most likely be the victor in the general election, and white voters have not been so polarized that they usually prevent minority preferred candidates from winning the democratic primary. Our analysis would obviously be inapplicable if a run-off were required to insure the primary winner had a majority of the vote, or if white voters (particularly white democrats) usually voted for white

republicans (instead of minority preferred winners of the democratic primary) in sufficient numbers to prevent minority preferred candidates from winning the general election.

**38.** Given that relief will be denied in all three areas due to the plaintiffs' failure to carry their burden as to the preconditions and denied in two areas because of the affirmative defense, we see no need to make findings with respect to the factors contained in the Senate Report.

certainly remain, subject to black voter control. The four other districts are likely to remain subject to majority group control. The black population is apparently slightly less than half the total population of the eight districts; therefore it seems obvious there is no "entitlement" to a fifth district, designed for black control, leaving only three districts subject to control by the white majority in the eight districts.

Similar analysis makes it reasonably clear there is no black entitlement to more districts in St. Louis City, given the racial makeup of the city. A contrary ruling would force redistricters to grant more than proportional representation to blacks.

I agree with plaintiffs that St. Louis County is problematic. If blacks indeed control four districts, they have approximately proportional representation, which is more than the Act mandates. The issue of ability to exercise "usual" control may be debatable, but I agree with the panel opinion that the present record does not permit a ruling that blacks in St. Louis County (or in the St. Louis metropolitan area as a whole) are likely to be underrepresented in the new districts.[1] We can also foresee a slight net gain in the number of black-controlled districts.

3. The much-touted supermajority guideline or requirement (65% of total population or 60% of voting population) as relied on in the leading case of *Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984), does not make sense in the present case, where we are dealing with the major hurdle of winning *primary* elections[2] and where there is evidence that 90% of the black voters are Democrats. There is no evidence of the party affiliation of white voters in the areas in question. It cannot be assumed that the white vote has the same extraordinary political polarization. If not, blacks will find it much easier to win Democratic primaries, to the extent the white vote is either drained into the Republican primary or is too independent to vote in the Democratic primary. This gives blacks a built-in advantage which counterbalances (wholly or in part) the factors supposedly requiring a supermajority.[3] It seems to me to be a statistical or analytical error of considerable magnitude to ignore this factor. To the extent the 65–60 rule is

---

1. It is possible that the panel opinion places an excessive burden on defendants by requiring them to show an extensive history of proportional representation. The *Gingles* test is one of persistence. 478 U.S. at 77, 106 S.Ct. at 2780. This may simply mean long-term, as distinguished from temporary or occasional. In evaluating the four new County districts, one is forced to predict the future in guessing whether black control will likely be the usual situation during this decade. For reasons stated below, I think this is probable.

2. No history has been established tending to show that white Democrats in Missouri will generally vote Republican to defeat a nominated black Democrat for state representative or similar office. There are a substantial number of races in Jackson County where black nominees have prevailed in political districts that are predominantly white, and few, if any, instances where judicial notice or the trial proof could confirm that general elections have been lost because of a racial crossover to elect white Republican nominees. The frequently cited Berkley–Watkins race for mayor in 1979 should perhaps not be counted, as municipal elections are officially nonpartisan, and Bruce Watkins did not have the advantage of a Democratic ballot listing. Even if counted, however, it is not part of a discernible pattern.

3. This conclusion is based on simple logic, if the white Republican vote has a materially higher percentage than the black Republican vote, as seems entirely likely. Judicial notice of two Congressional races tends to prove the soundness of the comment. In 1982 the black voting age population was rated at 20% in the Fifth Congressional District. *Almanac of American Politics 1988*, p. 680. The black contender, Alan Wheat, would not be expected to win as much as 20% of that vote, using the conventional discounting process. In the Democratic primary, however, he won 32% and was nominated because of divided opposition. *Id.* at 679. He thereafter carried the district on the Democratic ticket. In the same year, after redistricting, Congressman Clay's district in Eastern Missouri was rated as having a 46% black voting age population. *Id.* at 671. According to the conventional formula, he could not have been expected to win the Democratic primary against a prominent white opponent (particularly when there were recent controversial aspects of his career, as one is reminded by the *Almanac*). He won the Democratic primary by 61%, and carried the district with little trouble as the Democratic nominee. *Id.* at 671.

generally applicable throughout the country, as Judge Hamilton assumed from expert testimony relating to St. Louis County, it seems fairly applicable only when the *entire* population is voting in a particular election, or where it can be reasonably inferred that political polarization of white and black voters in a party primary is similar.

If the white voting age population in the most vulnerable black-majority district in St. Louis County (approximately 46%) should be deemed to have enough strength to routinely dominate the Democratic primary selection in that district, black voters would be able to control only 9.4% of the 32 legislative districts in the County, while having 12.6% of the voting age population, generally undispersed. This would create questions for me; under current law I might conclude that the county-line defense is insufficient to avoid a duty to cross into the City to pick up some of the excess black voting strength there in order to establish at least four districts in the County normally controlled by the black vote.[4]

On the present record, however, I am unable to conclude that the white voting population of District 71 (46%) is likely to be sufficient to exercise general control over the Democratic primary in that district, absent black voter acquiescence in the choice of a popular white representative, currently Representative Molloy. The party polarization of the black vote, the lack of proof of similar polarization of the white vote, the apparent sufficiency of a 51.2% black voting age majority to control the Democratic party primary in District 63

(Ronnie White's),[5] and the insufficiency of proof that the St. Louis area has a usual history of favoring white candidates over credible black candidates in districts with a black voting age majority, causes me to conclude that plaintiffs have failed to prove their case. I also believe the proportional representation defense probably dictates a similar result. Judgment should be entered in favor of defendants.

GAITAN, District Judge, concurring.

I agree with the majority opinion which artfully addresses the issues faced by this three judge panel. Additionally, I concur with Judge Sachs in numbered paragraph one of his concurring opinion. I will not restate the content of either here. However, I feel compelled to state the obvious. The evidence here fully acknowledges that African American voting patterns are polarized. This opinion should not leave the impression that the white American vote is considered to be less polarized. That might be improperly inferred by what appears to be a cushion of comfort which has resulted in the lowering of supermajority restrictions proposed by both the majority and concurring opinion. The historical data supports the results reached in these cases. Voting districts in both St. Louis City and Jackson County with less than 60% African American voting age population have been able to elect the candidates of their choice during the years reviewed in these cases. We know that was not always the case. However, we hope that it will continue to be the case.

---

4. I note, however, that the Seventh Circuit (The *Ketchum* circuit) has introduced a distinction between the liability stage and the remedial state of litigation, which would avoid supermajority analysis in this case. *Dickinson v. Indiana State Election Board,* 933 F.2d 497, 503 (7th Cir.1991). In his concurring opinion in this case, Judge Gaitan indicates discomfort with any general "lowering of the supermajority restrictions" and expresses concern about the polarized white vote. I have no reason to believe that the white vote in the Missouri metropolitan areas is less racially polarized than the black vote. The element of racial pride that affects the black vote is a more admirable trait than the continuing prejudice and sense of estrangement that too frequently affects white vot-

ing. This means it is an unusual accomplishment for black candidates to prevail in districts where they find themselves a minority, particularly a decided minority. It is my perception of law and current realism here in Missouri that a majority black voting age district or a 55% district should be relatively easy to control by black voters (with only temporary or intermittent exceptions) in a Democratic primary—and thereafter, with the Democratic label, in the general election.

5. His reelection is unopposed, according to the *St. Louis Post–Dispatch* of April 1, 1992, thus suggesting intimidating strength.

The majority opinion points out the elections of Congressman Wheat and Mayor Cleaver to show how far we have come. The initial election in the fifth congressional district of Congressman Alan Wheat in 1982 and of Emanuel Cleaver II as mayor of Kansas City, Missouri in 1991, prove merely that a plurality of voters were able to overcome the racially polarized voters. Had the white voters not been divided among two or more candidates, their polarized voting could have defeated the minority candidate. Had there only been two candidates in each of these elections, one white and one African American, neither public official would likely be serving today. Congressman Wheat has been re-elected four consecutive terms. He was given an opportunity to show his constituents he could represent their interest, race notwithstanding. Mayor Cleaver has a four year term. While he runs in a non-partisan election, historically the Kansas City, Missouri mayoral election has been very partisan.

What does this mean? That the voters of Jackson County and Kansas City, Missouri while voting in a racially polarized manner are at least willing to consider a candidate who survives the primary and serves their interest regardless of race. However, it has not been so long ago that racial attitudes were different.[1] We should be mindful of that when we begin lowering restrictions on such valuable rights as these. I believe this opinion has unique application to these facts.

---

**1.** The Bruce Watkins defeat is a reminder that surviving a primary does not guarantee victory. Mr. Watkins was a Democrat in a heavily Democratic city, but was African American and soundly defeated. White voters voted race and not party affiliation.